*MHW*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LASALLE BANK NATIONAL ASSOCIATION,<br><br>    Plaintiff,<br><br>v.<br><br>PARAMONT PROPERTIES, LLC and KEITH BARKET,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

**08CV2081**
**JUDGE ST.EVE**
**MAG.JUDGE DENLOW**

Case No.

**F I L E D**

APR 1 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## <u>COMPLAINT</u>

Plaintiff, LaSalle Bank National Association ("LaSalle"), by its attorneys Thompson Coburn Fagel Haber, for its Complaint against Paramont Properties LLC ("Paramont") and Keith Barket ("Barket"), states:

1.    LaSalle Bank National Association ("LaSalle") is a national banking association with its principal place of business in Chicago, Illinois. LaSalle is a citizen of Illinois.

2.    Defendant Keith Barket is a citizen of the state of Missouri.

3.    Defendant Paramont is a Missouri limited liability company whose sole member is Defendant Barket. Paramont is therefore a citizen of Missouri.

4.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 because there exists complete diversity between Plaintiff and the defendants, and the amount in controversy exceeds $75,000.00.

5.      Defendants Paramont and Barket are subject to personal jurisdiction in this Court because they voluntarily consented to jurisdiction in the State of Illinois by virtue of the forum selection clauses contained in the Promissory Note and Guaranty attached hereto as Exhibits A and D.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 and pursuant to the parties' contractual forum selection clause.

## COUNT I
### (Promissory Note)

For Count I of its Complaint against Paramont, LaSalle states:

7.      LaSalle restates and incorporates by reference its allegations contained in Paragraphs 1-6 of this Complaint as Paragraph 7 of Count I.

8.      Paramont sought to secure a loan from LaSalle in order to finance a construction project located in Jefferson County, Missouri.  The construction project involved  developing approximately 96 acres of unimproved real estate into a residential subdivision.

9.      On September 13, 2005, for valuable consideration, Paramont executed an unconditional promissory note in favor of LaSalle, whereby LaSalle agreed to loan and Paramont agreed to repay LaSalle the maximum commitment under the loan, which was $6,500,000.00.  A true and accurate copy of the Promissory Note is attached hereto as Exhibit A and expressly incorporated by reference herein.

10.      The loan was modified on February 7, 2006, whereby the maximum commitment was increased to $7,500,000.00.  A true and accurate copy of the Modification of Promissory Note and Deed of Trust, Security Agreement, Fixture

Filing and Assignment of Leases and Rents is attached hereto as <u>Exhibit B</u> and expressly incorporated by reference herein.

11.   On December 14, 2006, the parties entered into a second modification agreement whereby the maximum commitment under the loan was increased to $8,500,000.00.  A true and accurate copy of the Second Modification of Promissory Note and Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents is attached hereto as <u>Exhibit C</u> and expressly incorporated by reference herein.

12.   The loan was a revolving line of credit whereby LaSalle, upon Paramont's request, agreed to advance to Paramont loan proceeds up to the Maximum Commitment of $8,500,000.00.

13.   Pursuant to the Promissory Note, as modified, and in reliance upon Paramont's promise to repay, LaSalle did in fact loan to Paramont the sum of $8,500,000.00, which, as of September 24, 2007, was the outstanding principal balance due and owing to Lasalle under the loan.

14.   Paramont agreed to pay LaSalle interest on the unpaid principal balance, from the date of execution of the Promissory Note to the date of its maturity, whether by acceleration or otherwise, at either a floating rate equal to Prime Rate or LIBOR rate plus two and seventy five basis points.

15.   Paramont was required to make payments of principal and interest to LaSalle beginning on October 1, 2005, and on the first day of each month after that first payment.

16. By the terms of the Promissory Note, the following constitute events of default under the loan:

- if Paramont failed to pay (a) any installment of principal or interest within five (5) days of the due date.

- if Paramont failed to pay any other amount payable to LaSalle under the promissory note within five (5) days of the due date.

17. By the terms of the Promissory Note, in the event of default, the interest rate on the unpaid balance would then be equal to five percent plus the greater from time to time of (a) the Floating Rate, and (b) the Fixed Rate.

18. By the terms of the Promissory Note, upon the occurrence of an event of default, LaSalle could accelerate the outstanding indebtedness and demand that Paramont immediately pay the principal balance and all unpaid accrued interest.

19. LaSalle is the holder of the Promissory Note.

20. Paramont failed to pay LaSalle the interest due on September 1, 2007. Paramont's failure to make its September 1, 2007 interest payment constituted an event of default.

21. On or around September 24, 2007, counsel for LaSalle sent a letter to Paramont demanding that Paramont immediately pay LaSalle its September 1, 2007 interest payment. Paramont failed or refused to pay the interest payment due as of September 1, 2007.

22. On October 1, 2007, Paramont failed to pay LaSalle interest in the amount of $58,802.89 that was due on that date.

23.     As a result of Paramont's failure to pay LaSalle the interest payments due on September 1, 2007 and October 1, 2007, on or around October 22, 2007, counsel for LaSalle sent Paramont a letter notifying Paramont that it was in default of its obligation under the Promissory Note.

24.     LaSalle further notified Paramont on October 22, 2007, that, as a result of Paramont's default, LaSalle was exercising its right to accelerate the maturity of the loan and was therefore demanding the immediate payment of the outstanding balance and interest on the loan.

25.     Paramont has failed to pay the amounts due and owing to LaSalle under the Promissory Note, as modified.

26.     As of April 9, 2008, Paramont is indebted to LaSalle for the principal sum of $8,500,000.00, for accrued and unpaid interest in the amount of $593,249.20, and for late fees and other charges in the amount of $24,137.69. Interest continues to accrue on this obligation at the rate of $2,420.13 per day.

27.     Under the terms of the Promissory Note, Paramont agreed to pay any expenses incurred by LaSalle in collecting sums due under the Promissory Note, including reasonable costs and attorney's fees.

28.     LaSalle has incurred and will continue to incur substantial costs in attempting to collect payments due under the Promissory Note, including the cost of instituting this suit and reasonable attorney's fees related to its collection efforts.

WHEREFORE, LaSalle Bank National Association requests that this Court enter judgment in its favor against Defendant Paramont Properties LLC, for the

sum of $9,117,386.89, plus unpaid and accrued interest from April 9, 2008, at the rate of $2,420.13 per day, together with all costs and reasonable attorney's fees, and such other and further relief as this Court deems just and proper.

**COUNT II**
**(Guaranty)**

For Count II of its Complaint against Keith Barket, LaSalle states:

29.    LaSalle restates and incorporates by reference the allegations set forth in Paragraphs 1 through 28 of this Complaint as Paragraph 29 of Count II.

30.    On September 13, 2005, Defendant Keith Barket made and executed a Guaranty of Payment and Completion (hereinafter "Guaranty") by which he absolutely and unconditionally guaranteed to LaSalle the punctual payment and performance when due, whether at stated maturity or by acceleration or otherwise, of the indebtedness and other obligations of Paramont evidenced by the Promissory Note. A true and accurate copy of the Guaranty is attached hereto as Exhibit D and is expressly incorporated by reference herein.

31.    LaSalle has made demand upon Keith Barket for payment in full of the indebtedness of Paramont under the Promissory Note described in Count I of this Complaint.  Barket has refused that demand.

32.    As of April 1, 2008, Paramont is indebted to LaSalle for the principal sum of  $8,500,000.00, for accrued and unpaid interest in the amount of $593,249.20, and for late fees and other charges in the amount of $24,137.69.  Interest continues to accrue on this obligation at the rate of $2,420.13 per day.

33. Under the express terms of the Promissory Note executed by Paramont and unconditionally guaranteed by Keith Barket, LaSalle is entitled to recover all costs of collection thereof, including reasonable attorney's fees. Furthermore, Barket specifically agreed in his Guaranty that if Lasalle were required to take action to enforce its rights under the Guaranty, that Barket would be responsible for LaSalle's attorney's fees and expenses in attempting to enforce the Guaranty.

34. LaSalle has incurred and will continue to incur substantial costs in attempting to collect payments due under the Promissory Note and Guaranty, including the cost of instituting this suit and reasonable attorney's fees related to its collection efforts.

WHEREFORE, LaSalle Bank National Association requests that this Court enter judgment in its favor against Defendant Keith Barket, for the sum of $9,117,386.89, together with interest from April 9, 2008 at the rate of $2,420.13 per day, together with all costs and reasonable attorney's fees, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

Todd A. Rowden, #6201929
Scott Clair
55 East Monroe Street
40th Floor
Chicago, Illinois 60603
312-346-7500
FAX 312-580-2201
trowden@tcfhlaw.com

Mike W. Bartolacci
THOMPSON COBURN, LLP
One U.S. Bank Plaza, Suite 2600
St. Louis, MO  63101
(314) 552-6000 (telephone)
(314) 552-7000 (facsimile)
mbartolacci@thompsoncoburn.com

***Attorneys for Plaintiff Lasalle Bank National Association***

OF COUNSEL:
THOMPSON COBURN LLP d/b/a
THOMPSON COBURN FAGEL HABER

4718285_1

*Attorneys for Plaintiff Lasalle Bank National Association*

OF COUNSEL:
THOMPSON COBURN LLP d/b/a
THOMPSON COBURN FAGEL HABER

4718285_1

# EXHIBIT A

PROMISSORY NOTE  *7054929 77*

$6,500,000
Chicago, Illinois

No. _____

Date:  September 13, 2005
Due Date:  September 12, 2007

1.    AGREEMENT TO PAY.  For value received, Paramont Properties, L.L.C., a Missouri limited liability company (the "Borrower") hereby promises to pay to the order of LASALLE BANK NATIONAL ASSOCIATION, a national banking association, its successors and assigns (the "Lender"), the lesser of (i) the principal sum of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) (the "Maximum Commitment"), or (ii) the aggregate principal amount of all direct advances of the proceeds of this Note (each, an "Advance") made by the Lender to the Borrower hereunder and outstanding as of such date, on or before September 12, 2007 (the "Maturity Date"), at the place and in the manner hereinafter provided, together with interest thereon at the rate or rates described below, and any and all other amounts which may be due and payable hereunder from time to time.

2.    REVOLVING LINE OF CREDIT.

2.1.    The Loan.  Subject to the terms and conditions of this Note and the other Loan Documents (as hereinafter defined), the Lender agrees to make such direct Advances, to and for the benefit of the Borrower, at such times as the Borrower may from time to time request until, but not including, the Maturity Date, and in such amounts as the Borrower may from time to time request, provided, however, that the total of (a) the aggregate principal balance of all Advances (collectively referred to herein as the "Loan") outstanding at any time shall not exceed the Maximum Commitment and further provided that the total amount of Advances hereunder shall not exceed Nine Million Two Hundred Seven Thousand One Hundred Fifty and 00/100 Dollars ($9,207,150.00).  This Note evidences a revolving line of credit under which the Borrower is indebted to the Lender and evidences the aggregate unpaid principal amount of all Advances made or to be made by the Lender to the Borrower under this Note.  Subject to the limitation on the total Advances made hereunder stated above, Advances made by the Lender to the Borrower hereunder which have been repaid may be borrowed again.  All Advances and repayments hereunder shall be evidenced by entries on the books and records of the Lender which shall be presumptive evidence of the principal amount and interest owing and unpaid on this Note, or any renewal or extension hereof.  The failure to so record any such amount or any error so recording any such amount shall not, however, limit or otherwise affect the obligations of the Borrower hereunder or under any note to repay the principal amount of such liabilities, together with all interest accruing thereon.

2.2.    Advances.

(a)    The proceeds of this Note shall be made in the form of direct Advances.  Each Advance shall be made available to the Borrower by the Lender upon any written, electronic, telecopy or verbal loan request (provided that any verbal loan request is promptly confirmed in writing), which the Lender in good faith believes to emanate from a properly authorized representative of the Borrower, whether or not that is in fact the case.  All Advances made hereunder shall be conclusively presumed to have been made by the Lender to or for the benefit of the Borrower.  The proceeds of each Advance shall be made available at the office of the Lender by credit to the account of the Borrower or by other means requested by the Borrower and reasonably acceptable to the Lender.  The Borrower does hereby irrevocably confirm, ratify and approve all such Advances

by the Lender and does hereby indemnify the Lender against all reasonable losses and expenses (including court costs, reasonable attorneys' and paralegals' fees) in connection with all such loan requests and Advances, and shall hold the Lender harmless with respect thereto.

(b)     If any Advance is made by Lender into an escrow, such Advance shall be considered to be disbursed to Borrower from the date of deposit into that escrow, and interest shall accrue on such Advance from that date.

(c)     Borrower hereby requests and authorizes Lender to make Advances directly to itself for payment and reimbursement of all interest, charges, costs and expenses incurred by Lender in connection with the Loan, including, but not limited to, (i) interest due on the Loan and any points, loan fees, service charges, commitment fees or other fees due to Lender in connection with the Loan; (ii) all title examination, survey, escrow, filing, search, recording and registration fees and charges; (iii) all documentary stamp and other taxes and charges imposed by law on the issuance or recording of any of the Loan Documents; (iv) all appraisal fees; (v) all title, casualty, liability, payment, performance or other insurance or bond premiums; (vi) all reasonable fees and disbursements of legal counsel engaged by Lender in connection with the Loan, including, without limitation, counsel engaged in connection with the origination, negotiation, document preparation, consummation, enforcement or administration of this Note or any of the Loan Documents, which shall also include reasonable attorneys' fees and time charges of attorneys who may be employees of Lender or any affiliate of Lender; and (vii) any amounts required to be paid by Borrower under this Note, the Mortgage or any Loan Document after the occurrence of an Event of Default (all of which are herein referred to as the "Loan Expenses").

(d)     As a condition precedent to the initial Advance (the "Loan Advance"), Borrower agrees that it will deliver the following to Lender, all of which must be satisfactory to Lender and Lender's counsel in form, substance and execution:

(i)     Deed of Trust.  A Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of even date herewith (the "Mortgage"), duly executed by Borrower to and for the benefit of Lender, conveying good and marketable title to the Land (as herein defined) and granting a first lien on the Land to secure the Note, the Loan and all obligations of Borrower in connection therewith.

(ii)     Assignment of Rents and Leases.  An Assignment of Rents and Leases dated as of even date herewith (the "Assignment of Rents"), duly executed by Borrower to and for the benefit of Lender, collaterally assigning to Lender all of Borrower's rents, leases and profits of the Premises (as such term is defined in the Mortgage) as security for the Note, and, if Lender so requires, specific collateral assignments of any particular Leases (as hereinafter defined) bearing the consent to the assignment of the lessee whose Lease is so assigned.

(iii)     Financing Statements.  Uniform Commercial Code Financing Statements as required by Lender to perfect all security interests granted by the Mortgage.

2

(iv)     Guaranty.  A Guaranty of Payment and Completion dated as of even date herewith (the "Guaranty"), executed by Keith Barket (the "Guarantor") to and for the benefit of Lender, guaranteeing to Lender the payment of all amounts due in connection with the Loan and guaranteeing completion of the Project (as such term is defined in the Guaranty) pursuant to the terms of this Agreement and in accordance with all applicable law and free of claims of mechanics' liens and materialmen's liens.

(v)     Environmental Indemnity.  An Environmental Indemnity Agreement dated as of even date herewith (the "Environmental Indemnity"), jointly and severally executed by Borrower and Guarantor to and for the benefit of Lender, indemnifying Lender for all risks, liabilities, costs and expenses which may be incurred as a result of environmental matters at the Premises.

(vi)     Other Loan Documents.  Such other documents and instruments as further security for the Loan as Lender may reasonably require.

(vii)     Title Insurance Commitment.  A Commitment to issue an ALTA Loan Policy -- 1997 (the "Commitment") by Chicago Title Insurance Company (the "Title Insurance Company") in the full amount of the Loan committing to insure that the Mortgage is a valid first, prior and paramount lien on the Premises, subject only to the Permitted Exceptions (as such term is defined in the Mortgage), which Commitment (i) shall be free of all exceptions and objections relating to any right to assert claims for mechanics' liens on account of labor and/or materials theretofore furnished to the Premises; and (ii) shall include an ALTA Zoning Endorsement Form 3.1 amended to include parking, an unconditional Comprehensive Endorsement No. 1, or like "conformity" endorsement, a creditor's rights endorsement, an access endorsement, a one tax parcel endorsement, a contiguity endorsement (if applicable), a survey endorsement, a usury endorsement, a utility availability endorsement, an environmental lien endorsement, a variable rate endorsement, if applicable, and any other endorsement that Lender may reasonably request (the "Title Insurance Policy").

(viii)     Survey.  A plat of survey (the "Survey") of the Land (as herein defined) made by a land surveyor licensed in Missouri, which Survey must be satisfactory to the Lender in its sole discretion.  The Survey shall be made in accordance with (i) the current survey standards of the American Title Association and American Congress on Surveying and Mapping including items 1, 2, 3, 4, 6, 7(a) and (b), 8, 9, 10. 11(a) and (b), 13 and 17 of Table A thereof and (ii) the laws of the State.  The Survey shall be dated not later than sixty (60) days prior to the initial Loan Opening, and shall bear a proper certificate by the surveyor, which certificate shall recite compliance with the laws enumerated above, shall include the legal description of the Premises and shall run in favor of Borrower, Lender and the Title Insurance Company.

(ix)     Insurance Policies.  Borrower shall, during the term of this Agreement, procure at its expense and keep in force the insurance coverages required by the Mortgage.  In addition, all insurance shall be in

3

form, content and amounts approved by Lender and written by an insurance company or companies licensed to do business in the state in which the Premises (as defined in the Mortgage) are located and domiciled in the United States or a governmental agency or instrumentality approved by Lender.  The policies for such insurance shall have attached thereto standard mortgagee clauses in favor of and permitting Lender to collect any and all proceeds payable thereunder and shall include a thirty (30) day (except for nonpayment of premium, in which case a ten (10) day) notice of cancellation clause in favor of Lender.  All policies or certificates of insurance shall be delivered to and held by Lender as further security for the payment of the Note and any other obligations arising under the Loan Documents, with evidence of renewal coverage delivered to Lender at least thirty (30) days before the expiration date of any policy.

(x)     Environmental Report.     A written report (the "Environmental Report") prepared at Borrower's sole cost and expense by an independent professional environmental consultant approved by Lender in its sole and absolute discretion.  The Environmental Report shall be subject to Lender's approval in its sole and absolute discretion.  If the Environmental Report reveals contamination or conditions warranting further investigation in order to establish baseline data, Lender may require, in its sole and absolute discretion, a written report (also referred to herein as the "Environmental Report") based on additional testing and investigation in order to define the source and extent of the contamination or to establish baseline date, as well as to provide relevant detailed information on the area's geological and hydrogeological conditions.  Any additional Environmental Report prepared pursuant to this requirement shall be subject to Lender's approval, in its sole and absolute discretion.

(xi)     Appraisal.     An appraisal satisfactory and addressed to Lender prepared by a certified or licensed appraiser who is approved by Lender.  The appraisal must show an appraised value of the Premises such that the ratio of the Loan Amount to the appraised value of the Premises shall be no more than seventy-five percent (75%).

(xii)     Documents of Record.     Officially certified copies of all covenants, conditions, restrictions, easements and matters of record which affect the Premises.

(xiii)     Searches.     A report from the Title Insurance Company or the appropriate filing officers of the state and county in which the Land is located, indicating that no judgments, tax or other liens, security interests, leases of personalty, financing statements or other encumbrances (other than Permitted Exceptions and liens and security interests in favor of Lender) are of record or on file encumbering any portion of the Land, and that there are no judgments, tax liens, pending litigation or bankruptcy actions outstanding with respect to Borrower and the Guarantor.

(e)     At least ten (10) Business Days prior to, and as a condition of, each Advance, Borrower shall furnish to Lender the following documents covering such Advance:

(i)     Borrower's disbursement request (a "Request For Advance") in the form of Exhibit "A" attached hereto, which shall, among

4

other things specify the amount of the requested Advance (exclusive of interest); direct Lender to disburse such funds in accordance with this Note and the disbursement instructions contained in such Request for Advance; and certify to Lender, as of the date of the applicable request for disbursement, that:

(A)   the total amount of each request for disbursement (exclusive of interest) represents the actual amount payable for development work on the Land (as herein defined);

(B)   no Event of Default, or condition or event which, with the giving of notice or passage of time, or both, would constitute an Event of Default, exists under this Note or the other Loan Documents; and

(C)   Borrower has received no notice and has no knowledge of any liens or claims of lien either filed or threatened against the Premises (as herein defined) except the liens of Lender and those which are specifically identified in writing to Lender.

(ii)   Endorsements to the Lender's Title Insurance Policy issued or to be issued by the Title Insurance Company to cover the amount and date of the Advance (whether into escrow or otherwise) insuring that the Mortgage is a first, prior and paramount lien on the Land (as herein defined) subject only to permitted exceptions (and to exceptions and objections in the usual form relating to the issuance of a mortgage title insurance policy, which by their nature cannot be waived or removed until the final disbursement of the proceeds of the Loan), that nothing has intervened to affect the validity or priority of the Mortgage, insuring against mechanics' lien claims for work performed prior to the date covered by such continuation, and containing a mechanics' lien interim certification to cover the amount of the Loan then disbursed (including the current Advance); those endorsements may be delivered to Lender concurrently with the disbursement of the Advance which are the subject of those endorsements;

(iii)   Such other papers and documents as the Title Insurance Company may require for the issuance of endorsements to the Title Insurance Policy for each Advance; and

(iv)   Such other schedules, certificates, documents and other materials as Lender may reasonably request.

2.3.   **Loan Purpose**.   Advances made hereunder shall be used by Borrower to acquire certain real property located in Jefferson County, Missouri (the "Land") more particularly described in the Mortgage (as defined herein), and to make improvements thereon to develop the same in two (2) phases into residential lots, phase 1 of which shall consist of seventy-five (75) lots ("Phase I") and phase II of which shall consist of one hundred forty-six (146) lots ("Phase II"). Notwithstanding anything in this Note to the contrary, no Advance shall be made hereunder for the purpose of improvements to that part of the Land within Phase II until sixty percent (60%) of the lots in Phase I are sold.

WA 803871-2

3.    **INTEREST RATE.**

3.1.    Interest Prior to Default.

(a)    Interest shall accrue on the principal balance of this Note outstanding from the date hereof through the Maturity Date at the Borrower's option from time to time of (i) a floating per annum rate of interest (the "Floating Rate" equal to the Prime Rate (as hereinafter defined), or (ii) a per annum rate of interest (the "LIBOR Rate") equal to LIBOR (as hereinafter defined) for the relevant Interest Period (as hereinafter defined), plus two and seventy-five basis points (2.75%) (the "Applicable Margin"), such LIBOR Rate to remain fixed for such Interest Period. Changes in the Floating Rate to be charged hereunder based on the Prime Rate shall take effect immediately upon the occurrence of any change in the Prime Rate. Any portion of the principal amount of this Note bearing interest at the Floating Rate is referred to herein as a "Prime Loan". Any portion of the principal amount of this Note bearing interest at the LIBOR Rate is referred to herein as a "LIBOR Loan".

(b)    A request by the Borrower for a Prime Loan must be received by the Lender in writing no later than 2:00 p.m. Chicago, Illinois time, on any day other than a Saturday, Sunday or a legal holiday on which banks are authorized or required to be closed for the conduct of commercial banking business in Chicago, Illinois (a "Business Day"). As used herein, "Prime Rate" shall mean the floating per annum rate of interest most recently announced by the Lender at Chicago, Illinois as its prime or base rate. A certificate made by an officer of the Lender stating the Prime Rate in effect on any given day, for the purposes hereof, shall be conclusive evidence of the Prime Rate in effect on such day. The Prime Rate is a base reference rate of interest adopted by the Lender as a general benchmark from which the Lender determines the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness and the Borrower acknowledges and agrees that the Lender has made no representations whatsoever that the Prime Rate is the interest rate actually offered by the Lender to borrowers of any particular creditworthiness.

(c)    LIBOR Rate. The designation of a LIBOR Loan by the Borrower is subject to the following requirements:

(i)    A request for a LIBOR Loan (a "LIBOR Loan Request") must be received by the Lender no later than 2:00 p.m. Chicago, Illinois time two Business Days prior to the first day of the Interest Period on which such LIBOR Loan shall be advanced, shall be irrevocable, and shall state the initial Interest Period and amount of such LIBOR Loan. Each LIBOR Loan will be in an amount not less than Five Hundred Thousand and 00/100 Dollars ($500,000.00) or a higher integral multiple of One Hundred Thousand and 00/100 Dollars ($100,000.00). No more than five (5) separate LIBOR Loans may be outstanding at any time. A request for a LIBOR Loan received by the Lender after 2:00 p.m. Chicago, Illinois on any Business Day time will be processed and funded by the Lender on the third Business Day thereafter.

(ii)    If pursuant to the LIBOR Loan Request, the initial Interest Period of any LIBOR Loan commences on any day other than the first Business Day of any month, then the initial Interest Period of such LIBOR Loan shall end on the first day of the following calendar month,

6

notwithstanding the Interest Period specified in the LIBOR Loan Request, and the LIBOR Rate for such LIBOR Loan shall be equal to LIBOR for an interest period equal to the length of such partial month, plus the Applicable Margin.   Thereafter, each LIBOR Loan shall automatically renew (a "LIBOR Rollover") for the Interest Period specified in the LIBOR Loan Request at the then current LIBOR Rate plus the Applicable Margin unless the Borrower, in a subsequent LIBOR Loan Request received by the Lender no later than 2:00 p.m. Chicago, Illinois time on the second (2nd) Business Day before the expiration of the existing Interest Period, shall elect a different Interest Period or the conversion of all or a portion of the LIBOR Loan to a Prime Loan. The Borrower may not elect a LIBOR Rate, and an Interest Period for a LIBOR Loan shall not automatically renew, with respect to any principal amount which is scheduled to be repaid before the last day of the applicable Interest Period, and any such amounts shall bear interest at the Floating Rate, until repaid.

(iii)    "LIBOR" shall mean a rate of interest equal to (A) the per annum rate of interest at which United States dollar deposits in an amount comparable to the amount of the relevant LIBOR Loan and for a period equal to the relevant Interest Period are offered in the London Interbank Eurodollar market at 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period (or three Business Days prior to the commencement of such Interest Period if banks in London, England were not open and dealing in offshore United States dollars on such second preceding Business Day), as displayed in the *Bloomberg Financial Markets* system (or other authoritative source selected by the Lender in its sole discretion), divided by (B) a number determined by subtracting from 1.00 the then-stated maximum reserve percentage for determining reserves to be maintained by member banks of the Federal Reserve System for Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D), such rate to remain fixed for such Interest Period, or as LIBOR is otherwise determined by the Lender in its sole and absolute discretion.  The Lender's determination of LIBOR shall be conclusive, absent manifest error.

(iv)    "Interest Period" shall mean, with regard to any LIBOR Loan, successive one month periods; provided, however, that:  (A) each Interest Period occurring after the initial Interest Period of any LIBOR Loan shall commence on the day on which the preceding Interest Period for such LIBOR Loan expires; (B) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day; (C) whenever the first day of any Interest Period occurs on a date for which there is no numerically corresponding date in the month in which such Interest Period terminates, such Interest Period shall end on the last day of such month, unless such day is not a Business Day, in which case the Interest Period shall terminate on the first Business Day of the following month, provided, however, that so long as the LIBOR Rollover remains in effect, all subsequent Interest Periods shall terminate on the date of the month numerically corresponding to the date on which the initial Interest Period commenced; and (D) the final Interest Period for any LIBOR Loan must be such that its expiration occurs on or before the Maturity Date.  If at any time an Interest Period expires less than one month before the Maturity Date, such LIBOR Loan shall automatically

7                          WA 803871-2

convert to a Prime Loan on the last day of the then existing Interest Period, without further demand, presentment, protest or notice of any kind, all of which are hereby waived by the Borrower.

(v)     Notwithstanding anything to the contrary contained herein, the principal balance of any LIBOR Loan may not be prepaid in whole or in part at any time. If, for any reason, a LIBOR Loan is paid prior to the last Business Day of any Interest Period, whether voluntary, involuntary, by reason of acceleration or otherwise, each such prepayment of a LIBOR Loan will be accompanied by the amount of accrued interest on the amount prepaid and any and all costs, expenses, penalties and charges incurred by the Lender as a result of the early termination or breakage of a LIBOR Loan, plus the amount, if any, by which (A) the additional interest which would have been payable during the Interest Period on the LIBOR Loan prepaid had it not been prepaid, exceeds (B) the interest which would have been recoverable by the Lender by placing the amount prepaid on deposit in the domestic certificate of deposit market, the eurodollar deposit market, or other appropriate money market selected by the Lender, for a period starting on the date on which it was prepaid and ending on the last day of the Interest Period for such LIBOR Loan (collectively, the "Make Whole Costs"). The amount of any such loss or expense payable by the Borrower to the Lender under this section shall be determined in the Lender's sole discretion based upon the assumption that the Lender funded its loan commitment for LIBOR Loans in the London Interbank Eurodollar market and using any reasonable attribution or averaging methods which the Lender deems appropriate and practical, provided, however, that the Lender is not obligated to accept a deposit in the London Interbank Eurodollar market in order to charge interest on a LIBOR Loan at the LIBOR Rate.

(vi)     If the Lender determines in good faith (which determination shall be conclusive, absent manifest error) prior to the commencement of any Interest Period that (A) the making or maintenance of any LIBOR Loan would violate any applicable law, rule, regulation or directive, whether or not having the force of law, (B) United States dollar deposits in the principal amount, and for periods equal to the Interest Period, of any LIBOR Loan are not available in the London Interbank Eurodollar market in the ordinary course of business, (C) by reason of circumstances affecting the London Interbank Eurodollar market, adequate and fair means do not exist for ascertaining the LIBOR Rate to be applicable to the relevant LIBOR Loan, (D) the LIBOR Rate does not accurately reflect the cost to the Lender of a LIBOR Loan, or (E) an Event of Default (as hereinafter defined) has occurred and is continuing or any event or circumstance exists which, with the giving of notice or passage of time, would constitute an Event of Default, the Lender shall promptly notify the Borrower thereof and, so long as any of the foregoing conditions continue, the Lender will have no obligation to accept an election by the Borrower for a LIBOR Loan, and each existing LIBOR Loan, at the Borrower's option, shall be (1) converted to a Prime Loan on the last Business Day of the then existing Interest Period, or (2) due and payable on the last Business Day of the then existing Interest Period, without further demand, presentment, protest or notice of any kind, all of which are hereby waived by the Borrower.

8

(vii)    If, after the date hereof, a Regulatory Change (as hereinafter defined) shall, in the reasonable determination of the Lender, make it unlawful for the Lender to make or maintain any LIBOR Loans, the Lender will have no obligation to accept an election by the Borrower for a LIBOR Loan. In addition, at the Borrower's option, each existing LIBOR Loan shall be immediately (A) converted to a Prime Loan on the last Business Day of the then existing Interest Period or on such earlier date as required by law, or (B) due and payable on the last Business Day of the then existing Interest Period or on such earlier date as required by law, all without further demand, presentment, protest or notice of any kind, all of which are hereby waived by the Borrower. As used herein, "Regulatory Change" shall mean the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any governmental authority or any central bank or other fiscal, monetary or other authority having jurisdiction over the Lender or its lending office.

(viii)    If any Regulatory Change (whether or not having the force of law) shall (A) impose, modify or deem applicable any assessment, reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of, or loans by, or any other acquisition of funds or disbursements by, the Lender; (B) subject the Lender or any LIBOR Loan to any tax, duty, charge, stamp tax or fee, or change the basis of taxation of payments to the Lender of principal or interest due from the Borrower hereunder (other than a change in the taxation of the overall net income of the Lender); or (C) impose on the Lender any other condition regarding any LIBOR Loan or the Lenders' funding thereof, and the Lender shall determine (which determination shall be conclusive, absent manifest error) that the result of the foregoing is to actually increase the cost to the Lender of making or maintaining any LIBOR Loans or to reduce the amount of principal or interest received by the Lender hereunder on any LIBOR Loan, then the Borrower shall pay to the Lender, on demand, such additional amounts as the Lender shall from time to time determine are sufficient to compensate and indemnify the Lender for such increased costs or reduced amounts (the "LIBOR Indemnification Costs").

3.2.    Interest After Default. From and after the Maturity Date or upon the occurrence and during the continuance of an Event of Default, interest shall accrue on the unpaid principal balance during any such period at an annual rate (the "Default Rate") equal to five percent (5.00%) plus the greater from time to time of (a) the Floating Rate, and (b) the Fixed Rate; provided, however, in no event shall the Default Rate exceed the maximum rate permitted by law. The interest accruing under this section shall be immediately due and payable by the Borrower to the holder of this Note upon demand and shall be additional indebtedness evidenced by this Note.

3.3.    Interest Calculation. Interest on this Note shall be calculated on the basis of a 360 day year and the actual number of days elapsed in any portion of a month in which interest is due. If any payment to be made by the Borrower hereunder shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest in respect of such payment.

9

4. **PAYMENT TERMS.**

    4.1. **Principal and Interest.** Payments of principal and interest due under this Note, if not sooner declared to be due in accordance with the provisions hereof, shall be made as follows:

        (a)    Commencing on October 1, 2005, and continuing on the first day of each month thereafter through and including the month in which the Maturity Date occurs, payments of interest on the unpaid principal balance shall be due and payable. Interest accrued on any LIBOR Loan as of the date of termination, breakage or other disposition shall be due and payable in full on the date of such termination, breakage or disposition.

        (b)    Borrower shall make a principal payment of Fifty Thousand and 00/100 Dollars ($50,000) from the proceeds of the sale of each lot in Phase I and of Forty-Eight Thousand and 00/100 Dollars ($48,000) from the proceeds of the sale of each lot in Phase II.

        (c)    The unpaid principal balance of this Note, if not sooner paid or declared to be due in accordance with the terms hereof, together with all accrued and unpaid interest thereon and any other amounts due and payable hereunder or under any of the Loan Documents shall be due and payable in full on the Maturity Date.

    4.2. **Application of Payments.** Prior to the occurrence of an Event of Default, all payments and prepayments on account of the indebtedness evidenced by this Note shall be applied as follows: (a) first, to fees, expenses, costs and other similar amounts then due and payable to the Lender, including, without limitation any prepayment premium, exit fee or late charges due hereunder, (b) second, to accrued and unpaid interest on the principal balance of this Note, (c) third, to the payment of principal due in the month in which the payment or prepayment is made, (d) fourth, to any escrows, impounds or other amounts which may then be due and payable under the Loan Documents, (e) fifth, to any other amounts then due the Lender hereunder or under any of the Loan Documents, and (f) last, to the unpaid principal balance of this Note in the inverse order of maturity. Any prepayment on account of the indebtedness evidenced by this Note shall not extend or postpone the due date or reduce the amount of any subsequent monthly payment of principal and interest due hereunder. After an Event of Default has occurred and is continuing, payments may be applied by the Lender to amounts owed hereunder and under the Loan Documents in such order as the Lender shall determine, in its sole discretion.

    4.3. **Method of Payments.** All payments of principal and interest hereunder shall be paid by automatic debit, wire transfer, check or in coin or currency which, at the time or times of payment, is the legal tender for public and private debts in the United States of America and shall be made at such place as the Lender or the legal holder or holders of this Note may from time to time appoint in the payment invoice or otherwise in writing, and in the absence of such appointment, then at the offices of the Lender at 135 South La Salle Street, Suite 1225, Chicago, Illinois 60603. Payment made by check shall be deemed paid on the date the Lender receives such check; provided, however, that if such check is subsequently returned to the Lender unpaid due to insufficient funds or otherwise, the payment shall not be deemed to have been made and shall continue to bear interest until collected. Notwithstanding the foregoing, the final payment due under this Note must be made by wire transfer or other immediately available funds.

10

**4.4.    Late Charge.** If any payment of interest or principal due hereunder is not made within five days after such payment is due in accordance with the terms hereof, then, in addition to the payment of the amount so due, the Borrower shall pay to the Lender a "late charge" of five cents for each whole dollar so overdue to defray part of the cost of collection and handling such late payment. The Borrower agrees that the damages to be sustained by the holder hereof for the detriment caused by any late payment are extremely difficult and impractical to ascertain, and that the amount of five cents for each one dollar due is a reasonable estimate of such damages, does not constitute interest, and is not a penalty.

**4.5.    Principal Prepayments.** The portion of this Note bearing interest at the Floating Rate may be prepaid, either in whole or in part, without penalty or premium, at any time and from time to time upon fourteen (14) days prior notice to the Lender. The portion of this Note bearing interest at the LIBOR Rate may be prepaid only on the last day of an Interest Period; provided, however, that the Borrower may prepay a LIBOR Loan prior to such day so long as such prepayment is accompanied by a simultaneous payment of the Make Whole Costs described in Section 3.1(c)(v) above, plus accrued interest on the LIBOR Loan being prepaid through the date of prepayment.

**4.6.    Loan Fees.** In consideration of the Lender's agreement to make the Loan, the Borrower shall pay to the Lender a non-refundable fee in the amount of Twenty-Five Thousand and 00/100 Dollars ($25,000.00), which shall be due and payable in full as a condition precedent to the first disbursement of proceeds under this Note.

**5.    SECURITY.** This Note is secured by that certain: (a) Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of even date herewith, executed by the Borrower to and for the benefit of the Lender (the "Mortgage"), creating a first mortgage lien on certain real property (the "Premises") legally described in Exhibit "A" attached to the Mortgage; (b) Guaranty of Payment and Completion dated as of even date herewith, executed by Keith Barket, Sr. (the "Guarantor") to and for the benefit of the Lender (the "Guaranty"); and (c) Environmental Indemnity Agreement dated of even date herewith, jointly and severally executed by the Borrower and the Guarantor to and for the benefit of the Lender (the "Indemnity Agreement"); the Mortgage, the Assignment of Rents, the Guaranty, the Indemnity Agreement and any and all other document now or hereafter given to evidence or secure payment of this Note or delivered to induce the Lender to disburse the proceeds of the Loan, as such documents may hereafter be amended, restated or replaced from time to time, are hereinafter collectively referred to as the "Loan Documents"). Reference is hereby made to the Loan Documents (which are incorporated herein by reference as fully and with the same effect as if set forth herein at length) for a statement of the covenants and agreements contained therein, a statement of the rights, remedies, and security afforded thereby, and all matters therein contained.

**6.    EVENTS OF DEFAULT.** The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Note:

**6.1.**    the failure by the Borrower to pay (a) any installment of principal or interest payable pursuant to this Note within five (5) days after the date when due, or (b) any other amount payable to the Lender under this Note, the Mortgage or any of the other Loan Documents within five (5) days after the date when any such payment is due in accordance with the terms hereof or thereof; or

**6.2.**    the occurrence of any "Event of Default" under the Mortgage or any of the other Loan Documents.

7.   REMEDIES.   At the election of the holder hereof, and without notice, the principal balance remaining unpaid under this Note, and all unpaid interest accrued thereon and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default.  Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default.  No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.  The rights, remedies and powers of the holder hereof, as provided in this Note, the Mortgage and in all of the other Loan Documents are cumulative and concurrent, and may be pursued singly, successively or together against the Borrower, any Guarantor hereof, the Premises and any other security given at any time to secure the repayment hereof, all at the sole discretion of the holder hereof.  If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, the Borrower promises and agrees to pay all costs of collection, including reasonable attorneys' fees and court costs.

8.   COVENANTS AND WAIVERS.   The Borrower and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally:  (i) waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or by any extension or renewal hereof; (ii) waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest; (iii) except as expressly provided in the Loan Documents, waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder; (iv) waive any and all lack of diligence and delays in the enforcement of the payment hereof; (v) agree that the liability of the Borrower and each guarantor, endorser or obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by the Lender to any of them with respect hereto; (vi) consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; and (vii) consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, guarantors or other obligors, or security shall not affect the liability of the Borrower, any guarantor and all others now liable for all or any part of the obligations evidenced hereby.  This provision is a material inducement for the Lender making the Loan to the Borrower.

9.   GENERAL AGREEMENTS.

9.1.   Business Purpose Loan.   The Loan is a business loan which comes within the purview of Section 205/4, paragraph (1)(c) of Chapter 815 of the Illinois Compiled Statutes, as amended.  The Borrower agrees that the Loan evidenced by this Note is an exempted transaction under the Truth In Lending Act, 15 U.S.C., §1601, *et seq.*

9.2.   Time.   Time is of the essence hereof.

9.3.   Governing Law.   This Note is governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the statutes, laws and decisions of the State of Illinois, without regard to its conflict of laws provisions.

12

9.4.    Amendments.  This Note may not be changed or amended orally but only by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

9.5.    No Joint Venture.  The Lender shall not be construed for any purpose to be a partner, joint venturer, agent or associate of the Borrower or of any lessee, operator, concessionaire or licensee of the Borrower in the conduct of its business, and by the execution of this Note, the Borrower agrees to indemnify, defend, and hold the Lender harmless from and against any and all damages, costs, expenses and liability that may be incurred by the Lender as a result of a claim that the Lender is such partner, joint venturer, agent or associate.

9.6.    Disbursement.  This Note has been made and delivered at Chicago, Illinois and all funds disbursed to or for the benefit of the Borrower will be disbursed in Chicago, Illinois.

9.7.    Joint and Several Obligations.  If this Note is executed by more than one party, the obligations and liabilities of each Borrower under this Note shall be joint and several and shall be binding upon and enforceable against each Borrower and their respective successors and assigns.  This Note shall inure to the benefit of and may be enforced by the Lender and its successors and assigns.

9.8.    Severable Loan Provisions.  If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, the Borrower and the Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

9.9.    Interest Limitation.  If the interest provisions herein or in any of the Loan Documents shall result, at any time during the Loan, in an effective rate of interest which, for any month, exceeds the limit of usury or other laws applicable to the Loan, all sums in excess of those lawfully collectible as interest of the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by the Lender, with the same force and effect as though the payer has specifically designated such extra sums to be so applied to principal and the Lender had agreed to accept such extra payment(s) as a premium-free prepayment.  Notwithstanding the foregoing, however, the Lender may at any time and from time to time elect by notice in writing to the Borrower to reduce or limit the collection to such sums which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirements of the preceding sentence.  In no event shall any agreed to or actual exaction as consideration for this Loan transcend the limits imposed or provided by the law applicable to this transaction or the makers hereof in the jurisdiction in which the Premises are located for the use or detention of money or for forbearance in seeking its collection.

9.10.    Assignability.  The Lender may at any time assign its rights in this Note and the Loan Documents, or any part thereof and transfer its rights in any or all of the collateral, and the Lender thereafter shall be relieved from all liability with respect to such collateral.  In addition, the Lender may at any time sell one or more participations in the Note.  The Borrower may not assign its interest in this Note, or any other agreement with the Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of the Lender.

13

WA 803871-2

10.    NOTICES. All notices required under this Note will be in writing and will be transmitted in the manner and to the addresses required by the Mortgage, or to such other addresses as the Lender and the Borrower may specify from time to time in writing.

11.    CONSENT TO JURISDICTION. TO INDUCE THE LENDER TO ACCEPT THIS NOTE, THE BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN CHICAGO, ILLINOIS.    THE BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CHICAGO, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS UPON THE BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE BORROWER AT THE ADDRESS STATED IN THE MORTGAGE AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

12.    WAIVER OF JURY TRIAL. THE BORROWER AND THE LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (B) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

13.    WAIVER OF DEFENSES. OTHER THAN CLAIMS BASED UPON THE FAILURE OF THE LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, THE BORROWER WAIVES EVERY PRESENT AND FUTURE DEFENSE (OTHER THAN THE DEFENSE OF PAYMENT IN FULL), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE BORROWER MAY NOW HAVE OR HEREAFTER SEPTEMBER HAVE TO ANY ACTION BY THE LENDER IN ENFORCING THIS NOTE OR ANY OF THE LOAN DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER.

14.    CUSTOMER IDENTIFICATION - USA PATRIOT ACT NOTICE; OFAC AND BANK SECRECY ACT. The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and the Lender's policies and practices, the Lender is required to obtain, verify and record certain information and documentation that identifies the Borrower, which information includes the name and address of the Borrower and such other information that will allow the Lender to identify the Borrower in accordance with the Act. In addition, the Borrower shall (a) ensure that no person who owns a controlling interest in or otherwise controls the Borrower or any subsidiary of the Borrower is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause any of its subsidiaries to comply, with all applicable Bank Secrecy Act ("BSA") laws and regulations, as amended.

W:\ 803871-2

15.  EXPENSES AND INDEMNIFICATION.  The Borrower shall pay all costs and expenses incurred by the Lender in connection with the preparation of this Note and the Loan Documents, including, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of the Lender or any affiliate or parent of the Lender.  The Borrower shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Note and the other instruments and documents to be delivered hereunder, and agrees to save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.  The Borrower hereby authorizes the Bank to charge any account of the Borrower with the Bank for all sums due under this section.  The Borrower also agrees to defend (with counsel satisfactory to the Lender), protect, indemnify and hold harmless the Lender, any parent corporation, affiliated corporation or subsidiary of the Lender, and each of their respective officers, directors, employees, attorneys and agents (each an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and distributions of any kind or nature (including, without limitation, the disbursements and the reasonable fees of counsel for each Indemnified Party thereto, which shall also include, without limitation, attorneys' fees and time charges of attorneys who may be employees of the Lender, any parent corporation or affiliated corporation of the Lender), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities, environmental laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Note or any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation, execution and delivery of this Note and the Loan Documents, the making or issuance and management of the Loan, the use or intended use of the proceeds of this Note and the enforcement of the Lender's rights and remedies under this Note, the Loan Documents any other instruments and documents delivered hereunder, or under any other agreement between the Borrower and the Lender; provided, however, that the Borrower shall not have any obligations hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party.  To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, the Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law.  Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and failing prompt payment, together with interest thereon at the Default Rate from the date incurred by each Indemnified Party until paid by the Borrower, shall be added to the obligations of the Borrower evidenced by this Note and secured by the collateral securing this Note.  The provisions of this section shall survive the satisfaction and payment of this Note.  The Borrower shall also pay, and hold the Lender harmless from, any and all claims of any brokers, finders or agents claiming a right to any fees in connection with arranging the Loan.  The Lender hereby represents that it has not employed a broker or other finder in connection with the Loan.  The Borrower represents and warrants that no brokerage commissions or finder's fees are to be paid in connection with the Loan.

WA 803871-2

IN WITNESS WHEREOF, the Borrower has executed and delivered this Promissory Note as of the day and year first above written.

PARAMONT PROPERTIES, L.L.C.,
a Missouri limited liability company

By: _____
Name:        Keith Barket
Title:        Its Sole Member

WA 803871-2

## EXHIBIT "A"

## LOAN AGREEMENT

## REQUEST FOR ADVANCE

LaSalle Bank National Association
135 South LaSalle Street, Suite 1225
Chicago, Illinois 60603
Attention: Construction Loan Administration

PROJECT NAME:   Amberleigh Woods (the "Project")
BORROWER:      Paramont Properties, L.L.C. (the "Borrower")
DRAW NO:           _____

      Reference is hereby made to that certain Promissory Note dated as of September 13, 2005 (the "Note"), executed by and between the Borrower and LaSalle Bank National Association (the "Lender"). Capitalized words and phrases used herein without definition shall have the respective meanings ascribed to such words and phrases in the Note.

      1.    Pursuant to the Note, the Borrower hereby requests a Construction Disbursement in the amount of _____. The Borrower acknowledges that the approval of this Construction Disbursement by the Lender is subject to all of the terms and conditions precedent for the disbursement of Loan Proceeds, including, without limitation, inspection of the Project, verification of the matters set forth in this Request for Advance and the available of Loan Proceeds.

      2.    The Borrower agrees to provide, if requested by the Lender, a Vendor Payee List (Sworn Owner's Statement), showing the name and the amount currently due each party to whom the Borrower is obligated for labor, material and/or services supplied. This information would be provided in support of the disbursements requested in this Request for Advance.

      3.    The Borrower hereby represents, warrants and covenants with the Lender as follows:

          (a)    all conditions precedent to the disbursement have been satisfied, including, without limitation, performance of all of the then pending obligations of Borrower under the Note and the other Loan Documents;

          (b)    all representations and warranties made by the Borrower to the Note in the Note and otherwise in connection with the Loan continue to be accurate;

          (c)    no Event of Default has occurred under the Note or under any Loan Document, and no event, circumstance or condition has occurred or exists which, with the passage of time or the giving of notice, would constitute a Event of Default under the Note or under the other Loan Documents;

          (d)    the Borrower has received no notice and has no knowledge of any litigation, proceedings (including proceedings under Title 11 of the United States Code), liens or claims of lien, either filed or threatened against the Borrower, any Guarantor, the Project or the Premises, except the liens of the Lender and those which are specifically identified in writing to the Lender.

WA 803871-2

4.   Disbursement of the Loan proceeds requested hereby may be subject to the receipt by the Bank of a certificate from the issuing Title Company stating that no claims have been filed of record which adversely affects the title.

5.   The Borrower hereby agrees and acknowledges that this affidavit is made for the purpose of inducing the Lender to make a Construction Disbursement to the Borrower and, the Lender is relying upon the accuracy of such matters in making such Construction Disbursement, and the Borrower certifies that the statements made herein and in any documents submitted herewith are true and correct.

6.   The Borrower requests that this draw be funded and that the funds be disbursed into the Construction Escrow No. _____ at _____ or deposited to the following account number _____ at _____.

IN WITNESS WHEREOF, the Borrower has executed this Request for Advance as of _____, 200__.

PARAMONT PROPERTIES, L.L.C.,
a Missouri limited liability company

By: _____
Name:      Keith Barket
Title:      Its Sole Member

# EXHIBIT B

*2006R-014705 7*

## 2006R-014705

FILED AND RECORDED
IN OFFICIAL RECORD OF
JEFFERSON COUNTY, MO

03/28/2006    09:17:13AM

MARLENE CASTLE
RECORDER OF DEEDS

PAGES   7
REC FEE: 42.00
NS FEE:

*UST*
*42*

⑤

# MISSOURI

# RECORDING COVER SHEET

**Name of Document:** Modification of Promissory Note and Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents

**Date of Document:**  February 1, 2006

**Grantor(s):** The Grantor is Paramont Properties, L.L.C.

**Grantee(s):** The Grantee/Beneficiary is LaSalle Bank National Association

**Description:** The Legal Description appears on Exhibit "A" which starts on page 4

**Statutory Address(es), if any:** The Grantor's address is 705 Olive St., 4th Floor, St. Louis, Missouri  63101

**The Grantee/Beneficiary's address is:** 135 South LaSalle Street, Suite 1225, Chicago, Illinois  60603

**Statutory Recording Reference, if any:**

_andAmerica Co___ _____ __th
Commonwealth ____ ___le
10669 Hig___ ___ __50
Hillsboro, ___

WA 838052.1

# MODIFICATION OF PROMISSORY NOTE AND DEED OF TRUST, SECURITY AGREEMENT,

## ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING

This MODIFICATION OF PROMISSORY NOTE AND DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING dated as of February 1, 2006 ("Modification Agreement"), is executed by Paramont Properties, L.L.C., a Missouri limited liability company (the "Mortgagor"), to James R. Dankenbring, having offices at Spencer Fane Britt & Browne LLP, 1 North Brentwood Boulevard, St. Louis, Missouri 63105-3925, as Trustee (the "Trustee"), to and for the benefit of LASALLE BANK NATIONAL ASSOCIATION, a national banking association, its successors and assigns (the "Lender").

## R E C I T A L S:

A.     Pursuant to the terms and conditions contained in that certain Promissory Note dated September 13, 2005 (the "Note"), executed by and between the Mortgagor and the Lender, the Lender agreed to loan to the Mortgagor up to the maximum principal amount outstanding at any time of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) (the "Loan").

B.     Payment and performance of Mortgagor's obligations under the Note is secured in part by that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated September 13, 2005 (the "Deed of Trust"), encumbering the real property more particularly described on Exhibit A attached hereto and incorporated by reference, which Deed of Trust was recorded in the Office of the Register of Deeds of _____ County on _____, 2005, as Document #_____ in Book ___ beginning at Page _____. *RECORDED OF EVEN DATE HEREWITH*

C.     Mortgagor has requested that Lender increase the amount of the Loan, and subject to the terms and conditions hereof, Lender has agreed to same.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor agrees as follows:

## A G R E E M E N T S:

1.     Amendment of the Note.  Paragraph 1 of the Note is modified and amended to provide that the Maximum Commitment thereunder shall be Seven Million Five Hundred Thousand and 00/100 Dollars ($7,000,000.00).

2.     Amendment of the Mortgage.  Paragraph 2 of the Deed of Trust is deleted in its entirety and replaced with the following:

"THIS MORTGAGE SECURES FUTURE ADVANCES AND FUTURE OBLIGATIONS AND IS GOVERNED BY SECTION 443.055 OF THE REVISED STATUTES OF MISSOURI. THE TOTAL PRINCIPAL AMOUNT OUTSTANDING AT ANY ONE TIME WHICH IS SECURED BY THIS DEED OF TRUST SHALL NOT EXCEED TEN MILLION F AND 00/100 DOLLARS ($10,000,000.00), plus interest due under any other loan documents and any additional sums advanced by Lender for the reasonable protection of the liens and security interests created by and granted in this Deed of Trust."

1

3.    Reaffirmation.  Borrower hereby acknowledges and confirms that (i) the Note, the Deed of Trust and all other documents executed and delivered to or for the benefit of Lender in connection with the Loan (the "Loan Documents") remain in full force and effect, (ii) Borrower has no defenses to its obligations under the Note and the other Loan Documents, (iv) Borrower has no claim against Lender arising from or in connection with the Note or the other Loan Documents. Each of the Amendment Documents (as defined in Section 4 below) are a part of the Loan Documents.

4.    Representations and Warranties of Borrower.  Borrower hereby represents and warrants to Lender as of the date hereof that (i) this Modification Agreement and each of the other documents, agreements, certificates executed in connection herewith (the "Amendment Documents") have been duly authorized by Borrower's sole member, as the case may be, (ii) no consents are necessary from any third Person for Borrower's execution, delivery or performance of this Modification Agreement and the Amendment Documents which have not been obtained, (iii) this Modification Agreement, the Amendment Documents and all other Loan Documents constitute the legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms except as the enforcement thereof may be limited by bankruptcy, insolvency or other laws related to creditors rights generally or by the application of equity principles, (iv) there exists no Default or Event of Default under the Note and no Default or Event of Default is reasonably likely to occur as a result of the transactions contemplated by this Modification Agreement and the Amendment Documents, (v) there are no proceedings or any kind, pending or threatened against Borrower which could reasonably be expected to result in a material adverse effect, and (vi) all representations and warranties of Borrower contained in the Loan Documents or otherwise made in writing to Lender in connection therewith by or on behalf of Borrower are true and correct.

5.    Governing Law.  This Amendment shall be governed by and construed under the laws of the State of Illinois without giving effect to choice or conflicts of law principles thereunder.

6.    Section Titles.  The section titles in this Modification Agreement are for convenience of reference only and shall not be construed so as to modify any provisions of this Modification Agreement.

7.    Counterparts; Facsimile Transmissions.  This Modification Agreement may be executed in one or more counterparts and on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures to this Modification Agreement may be given by facsimile or other electronic transmission, and such signatures shall be fully binding on the party sending the same.

8.    Miscellaneous.

(a)    All terms and conditions of the Note and Deed of Trust and of other documents executed in connection therewith outstanding as of the date hereof which have been executed by the Mortgagor and which are not expressly modified by this Modification Agreement shall remain in full force and effect as if this Modification Agreement had not been executed and delivered.

(b)    All references in the Note or the Deed of Trust to the Note or the Deed of Trust shall be deemed to refer to the Note and the Deed of Trust as hereby modified and amended.

(c)    This Modification Agreement shall become effective upon the date of (i) execution of this Modification Agreement by the Mortgagor and the Lender; (ii) the delivery

WA 838052.1

by the Mortgagor to the Lender of resolutions of the members of the Mortgagor, duly adopted, authorizing the execution and performance of this Modification Agreement; (iii) the deliver to Lender of a date-down of Chicago Title Insurance Company's Loan Policy # _____.

    (d)    This Modification Agreement shall be binding upon Mortgagor and Lender and each of their respective successors and assigns.

    4.    <u>Missouri Statutory Statement</u>.  The following notice is included in this Agreement pursuant to § 432.047, R.S.Mo.:  **ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT THE PARTIES HERETO FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS THE PARTIES REACH COVERING SUCH MATTERS ARE CONTAINED IN AGREEMENT, THE NOTE, AND THE OTHER LOAN DOCUMENTS ALL OF WHICH SHALL BE CONSTRUED AS ONE WRITING, WHICH ARE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

    IN WITNESS WHEREOF, the parties hereto have executed this Modification Agreement on the day and year first above written.

LASALLE BANK NATIONAL
ASSOCIATION

By _____
Name:  Paul A. LaKamp
Title:    Vice President

PARAMONT PROPERTIES, L.L.C.,
a Missouri limited liability company

By: _____
Name:  Keith Barket, Sr.
Title:  Its Sole Member

## CONSENT AND ACKNOWLEDGEMENT

    By his signature below, the undersigned (i) acknowledges and consents to the execution of the foregoing Modification Agreement; and (ii) agrees that execution and delivery thereof by Paramont Properties, L.L.C., does not and shall not affect the validity and enforceability of the Guaranty of Payment and Performance executed by the undersigned to and for the benefit of LaSalle Bank National Association dated September 13, 2005.

| | |
|---|---|
| | _____ |
| | Keith Barket, Sr. |

WA 838052.1

STATE OF MISSOURI ) 
                              )                                                                    ss:
COUNTY OF ST. LOUIS )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DO HEREBY CERTIFY that Keith Barket, Sr., the Sole Member of Paramont Properties, L.L.C. a Missouri limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Sole Member appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this __7__ day of February, 2006.

_____
Notary Public

My Commission Expires:

" NOTARY SEAL "
Yvonne C. Merlotti, Notary Public
St. Louis County, State of Missouri
My Commission Expires 7/30/2007

STATE OF MISSOURI ) 
                              )                                                                    ss:
COUNTY OF ST. LOUIS )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DO HEREBY CERTIFY that Paul A. LaKamp, the Vice President of LaSalle Bank National Association, a national banking association, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Vice President appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this __7__ day of February, 2006.

_____
Notary Public

My Commission Expires:

" NOTARY SEAL "
Yvonne C. Merlotti, Notary Public
St. Louis County, State of Missouri
My Commission Expires 7/30/2007

4

WA 838052.1

## EXHIBIT "A"

## PROPERTY ADDRESS OF REAL ESTATE:

3350 Lions Den Road

Arnold, Missouri

## LEGAL DESCRIPTION OF REAL ESTATE

A tract of land in U.S. Survey 2970, and in fractional Section 3, Township 42 North, Range 5 East, Jefferson County, Missouri, and being more particularly described as follows:

Beginning at an old stone on the Southwest line of said U.S. Survey at the intersection of said Southwest line and the Southeast line of the land of Magdalena Lefarth, as recorded in Deed Book 731, Page 371, Jefferson County records; thence along said Southeast line North 47 degrees 29 minutes 53 seconds East 1754.07 feet; thence continuing along said Southeast line North 17 degrees 48 minutes 47 seconds East 59.53 feet to an iron rod (set); thence continuing along said Southeast line North 37 degrees 16 minutes 36 seconds East 15.91 feet to an old iron rod; thence continuing along said Southeast line North 50 degrees 26 minutes 23 seconds East 45.86 feet to an old iron rod; thence continuing along said Southeast line North 60 degrees 14 minutes 02 seconds East 27.54 feet; thence leaving said Southeast line and defining the parcel herein described South 52 degrees 16 minutes 17 seconds East 203.96 feet; thence on a tangent curve to the left having a radius of 25.00 feet, an arc distance of 36.32 feet to a point of reverse curvature; thence on a tangent curve to the right having a radius of 400.00 feet, an arc distance of 22.08 feet; thence North 47 degrees 38 minutes 54 seconds East 279.99 feet; thence on a tangent curve to the right having a radius of 400.00 feet, an arc distance of 68.91 feet; thence North 57 degrees 31 minutes 10 seconds East 206.83 feet to the Southwesterly line of Lions Den Road, as widened; thence along said Southwesterly line South 32 degrees 28 minutes 50 seconds East 25.78 feet to an iron rod (set); thence continuing along said Southwesterly line on a tangent curve to the right having a radius of 472.69 feet, an arc distance of 24.23 feet; thence leaving said Southwesterly line and defining the parcel herein described South 57 degrees 31 minutes 10 seconds West 206.21 feet; thence on a tangent curve to the left having a radius of 350.00 feet, an arc distance of 60.30 feet; thence South 47 degrees 38 minutes 54 seconds West 279.99 feet; thence on a tangent curve to the left having a radius of 350.00 feet, an arc distance of 93.07 feet; thence South 52 degrees 36 minutes 51 seconds East 675.85 feet; thence South 42 degrees 24 minutes 00 Seconds East 109.50 feet; thence North 47 degrees 36 minutes 00 seconds East 365.34 feet to the Southerly line of the land of Jefferson County, as recorded in Deed Book 908, Page 1408, Jefferson County Records; thence along said Southerly line North 80 degrees 28 minutes 13 seconds East 52.06 feet to an iron rod (set); thence continuing along said Southerly line North 73 degrees 54 minutes 39 seconds East 121.69 feet to an iron rod (set) on the Northwesterly line of the land of Alfred Barbagallo, et al., as recorded in Deed Book 712, Page 627, Jefferson County

WA 838052.1

Records; thence along said Northwesterly line South 47 degrees 31 minutes 15 seconds West 2183.75 feet to an old iron rod; thence continuing along said Northwesterly line South 46 degrees 48 minutes 03 seconds West 334.41 feet to an old stone on the aforesaid Southwest line of U. S. Survey 2970; thence along said Southwest line North 42 degrees 39 minutes 08 seconds West 869.74 feet to the Westerly line of aforesaid Alfred Barbagallo, et al.; thence along said Westerly line South 14 degrees 32 minutes 58 seconds West 536.88 feet to an iron rod (set on the East line of the Northwest Quarter of the Southwest Quarter of said Section 3; thence along said East line North 00 degrees 23 minutes 40 seconds East 257.23 feet to the centerline of a creek, as described as the Westerly line of the land of Jacob Blank as described in Deed Book 15, Page 172, Jefferson County Records; thence along said centerline South 18 degrees 13 minutes 12 seconds West 432.72 feet; thence continuing along said centerline South 03 degrees 36 minutes 57 seconds East 218.29 feet; thence continuing along said centerline South 25 degrees 16 minutes 11 seconds West 106.92 feet; thence continuing along said centerline South 13 degrees 06 minutes 21 seconds East 199.92 feet to the South line of the Northwest Quarter of the Southwest Quarter of said Section 3; thence along said South line North 89 degrees 32 minutes 53 seconds West 1230.85 feet to an old iron rod on the West line of said Section 3; thence along said West line North 00 degrees 23 minutes 34 seconds East 1342.38 feet to an old concrete monument at the West Quarter corner of said Section 3; thence along the North line of the Southwest Quarter of said Section 3, North 89 degrees 35 minutes 53 seconds East 308.43 feet to an old concrete monument on the Southeasterly line of the land of Lions Club South Side St. Louis, as recorded in Deed Book 382, Page 473, Jefferson County Records; thence along said Southeasterly line North 61 degrees 19 minutes 37 seconds East 442.20 feet to an old concrete monument; thence continuing along said Southeasterly line North 47 degrees 33 minutes 23 seconds East 131.65 feet to an old concrete monument; thence continuing along said Southeasterly line North 35 degrees 03 minutes 17 seconds East 198.48 feet to an old concrete monument on the aforesaid Southwest line of U. S. Survey 2970; thence along said Southwest line South 41 degrees 31 minutes 58 seconds East 601.89 feet to the point of beginning of this description.

WA 838052.1

# EXHIBIT C

LBNA / Commercial

70549297773

Copy
original to be
recorded @
title compan

# MISSOURI

# RECORDING COVER SHEET

**Name of Document:** Second Modification of Promissory Note and Deed of Trust, Security Agreement, Fixture Filing and Assignment of Leases and Rents

**Date of Document:** December 14, 2006

**Grantor(s):** The Grantor is Paramont Properties, L.L.C.

**Statutory Address(es), if any:** The Grantor's address is 705 Olive St., 4th Floor, St. Louis, Missouri 63101

**Grantee(s):** The Grantee/Beneficiary is LaSalle Bank National Association

**The Grantee/Beneficiary's address is:** 135 South LaSalle Street, Suite 1225, Chicago, Illinois 60603

**Description:** The Legal Description appears on Exhibit "A" which starts on page 5

**Statutory Recording Reference, if any:** Document No. 2006R-014704

WA 878331.1

## SECOND MODIFICATION OF PROMISSORY NOTE AND DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS

### AND LEASES AND FIXTURE FILING

This SECOND MODIFICATION OF PROMISSORY NOTE AND DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING dated as of December 1⁴, 2006 ("Modification Agreement"), is executed by Paramont Properties, L.L.C., a Missouri limited liability company (the "Mortgagor"), to James R. Dankenbring, having offices at Spencer Fane Britt & Browne LLP, 1 North Brentwood Boulevard, St. Louis, Missouri 63105-3925, as Trustee (the "Trustee"), to and for the benefit of LASALLE BANK NATIONAL ASSOCIATION, a national banking association, its successors and assigns (the "Lender").

### RECITALS:

A.    Pursuant to the terms and conditions contained in that certain Promissory Note dated September 13, 2005 (the "Note"), executed by and between the Mortgagor and the Lender, as amended, the Lender agreed to loan to the Mortgagor up to the maximum principal amount outstanding at any time of Seven Million and 00/100 Dollars ($7,000,000.00) (the "Loan").

B.    Payment and performance of Mortgagor's obligations under the Note is secured in part by that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated September 13, 2005 (the "Deed of Trust"), encumbering the real property more particularly described on Exhibit A attached hereto and incorporated by reference, which Deed of Trust was recorded in the Office of the Register of Deeds of Jefferson County on March 28, 2006, as Document #2006R-014704.

C.    Mortgagor has requested that Lender increase the amount and extend the term of the Loan, and subject to the terms and conditions hereof, Lender has agreed to same.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor agrees as follows:

### AGREEMENTS:

1.    Amendment of the Note.

(a)    Paragraph 1 of the Note is modified and amended to provide that the Maximum Commitment thereunder shall be Eight Million Five Hundred Thousand and 00/100 Dollars ($8,500,000.00) and to change the Maturity Date from September 12, 2007, to May 1, 2008.

Paragraph 2.1 of the Note is amended as follows by deleting the words and numbers "Nine Million Two Hundred Seven Thousand One Hundred Fifty and 00/100 Dollars ($9,207,150.00) and substituting in their place: "Ten Million Seven Hundred Ninety Four Thousand One Hundred Thirty Three and 00/100 Dollars ($10,794,133.00)".

2.    Amendment of the Deed of Trust.

(a)    Paragraph 2 of the Deed of Trust is deleted in its entirety and replaced with the following:

WA 878331.1

"THIS MORTGAGE SECURES FUTURE ADVANCES AND FUTURE OBLIGATIONS AND IS GOVERNED BY SECTION 443.055 OF THE REVISED STATUTES OF MISSOURI. THE TOTAL PRINCIPAL AMOUNT OUTSTANDING AT ANY ONE TIME WHICH IS SECURED BY THIS DEED OF TRUST SHALL NOT EXCEED TEN MILLION SEVEN HUNDRED NINETY-FOUR THOUSAND ONE HUNDRED THIRTY-THREE AND 00/100 DOLLARS ($10,794,133.00), plus interest due under any other loan documents and any additional sums advanced by Lender for the reasonable protection of the liens and security interests created by and granted in this Deed of Trust."

(b)      Paragraph 37(h) of the Deed of Trust is amended to provide that in no event shall the Indebtedness exceed an amount equal to Ten Million Seven Hundred Ninety-Four Thousand One Hundred Thirty-Three and 00/100 Dollars ($10,794,133.00).

3.      <u>Reaffirmation.</u>  Borrower hereby acknowledges and confirms that (a) the Note, the Deed of Trust and all other documents executed and delivered to or for the benefit of Lender in connection with the Loan (the "Loan Documents") remain in full force and effect, (b) Borrower has no defenses to its obligations under the Note and the other Loan Documents, and (c) Borrower has no claim against Lender arising from or in connection with the Note or the other Loan Documents. Each of the Amendment Documents (as defined in Section 4 below) are a part of the Loan Documents.

4.      <u>Representations and Warranties of Borrower.</u>  Borrower hereby represents and warrants to Lender as of the date hereof that (a) this Modification Agreement and each of the other documents, agreements, certificates executed in connection herewith (the "Amendment Documents") have been duly authorized by Borrower's sole member, as the case may be, (b) no consents are necessary from any third Person for Borrower's execution, delivery or performance of this Modification Agreement and the Amendment Documents which have not been obtained, (c) this Modification Agreement, the Amendment Documents and all other Loan Documents constitute the legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms except as the enforcement thereof may be limited by bankruptcy, insolvency or other laws related to creditors rights generally or by the application of equity principles, (d) there exists no Default or Event of Default under the Note and no Default or Event of Default is reasonably likely to occur as a result of the transactions contemplated by this Modification Agreement and the Amendment Documents, (e) there are no proceedings or any kind, pending or threatened against Borrower which could reasonably be expected to result in a material adverse effect, and (f) all representations and warranties of Borrower contained in the Loan Documents or otherwise made in writing to Lender in connection therewith by or on behalf of Borrower are true and correct.

5.      <u>Governing Law.</u>  This Amendment shall be governed by and construed under the laws of the State of Illinois without giving effect to choice or conflicts of law principles thereunder.

6.      <u>Section Titles.</u>  The section titles in this Modification Agreement are for convenience of reference only and shall not be construed so as to modify any provisions of this Modification Agreement.

7.      <u>Counterparts; Facsimile Transmissions.</u>  This Modification Agreement may be executed in one or more counterparts and on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures to this Modification Agreement may be given by facsimile or other electronic transmission, and such signatures shall be fully binding on the party sending the same.

8.      <u>Miscellaneous.</u>

WA 878331.1

(a)    All terms and conditions of the Note and Deed of Trust and of other documents executed in connection therewith outstanding as of the date hereof which have been executed by the Mortgagor and which are not expressly modified by this Modification Agreement shall remain in full force and effect as if this Modification Agreement had not been executed and delivered.

(b)    All references in the Note or the Deed of Trust to the Note or the Deed of Trust shall be deemed to refer to the Note and the Deed of Trust as hereby modified and amended.

(c)    This Modification Agreement shall become effective upon the date of (i) execution of this Modification Agreement by the Mortgagor and the Lender; (ii) the delivery by the Mortgagor to the Lender of resolutions of the members of the Mortgagor, duly adopted, authorizing the execution and performance of this Modification Agreement; (iii) the deliver to Lender of a date-down of Chicago Title Insurance Company's Loan Policy #MO2180-46-5-25807-2006.7210773-71403010.

(d)    This Modification Agreement shall be binding upon Mortgagor and Lender and each of their respective successors and assigns.

9.    <u>Missouri Statutory Statement</u>.  The following notice is included in this Agreement pursuant to § 432.047, R.S.Mo.:  **ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE NOTE.  TO PROTECT THE PARTIES HERETO FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS THE PARTIES REACH COVERING SUCH MATTERS ARE CONTAINED IN THE NOTE, AND THE OTHER LOAN DOCUMENTS, EACH AS AMENDED HEREBY, ALL OF WHICH SHALL BE CONSTRUED AS ONE WRITING, WHICH ARE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

IN WITNESS WHEREOF, the parties hereto have executed this Modification Agreement on the day and year first above written.

LASALLE BANK NATIONAL ASSOCIATION

By: _____
Name:  Paul A. LaKamp
Title:   Vice President

PARAMONT PROPERTIES, L.L.C.,
a Missouri limited liability company

By: _____
Name:  Keith Barket,
Title:   Its Sole Member

3

## CONSENT AND ACKNOWLEDGEMENT

By his signature below, the undersigned (i) acknowledges and consents to the execution of the foregoing Modification Agreement; and (ii) agrees that execution and delivery thereof by Paramont Properties, L.L.C., does not and shall not affect the validity and enforceability of the Guaranty of Payment and Performance executed by the undersigned to and for the benefit of LaSalle Bank National Association dated September 13, 2005.

Keith Barket,

STATE OF MISSOURI     )
                            )                                                  ss:
COUNTY OF ST. LOUIS    )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DO HEREBY CERTIFY that Keith Barket, Sr., the Sole Member of Paramont Properties, L.L.C. a Missouri limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Sole Member appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 19 day of December, 2006.

" NOTARY SEAL "
Yvonne C. Merlotti, Notary Public
St. Louis County, State of Missouri
My Commission Expires 7/30/2007

My Commission Expires:

Notary Public

STATE OF MISSOURI     )
                            )                                                  ss:
COUNTY OF ST. LOUIS    )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DO HEREBY CERTIFY that Paul A. LaKamp, the Vice President of LaSalle Bank National Association, a national banking association, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Vice President appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 19th day of December, 2006.

My Commission Expires: June 17, 2008

Notary Public

Ken A. Baker
Notary Public - Notary Seal
State of Missouri
County of Jefferson
Expires June 17 2008

4

WA 878331 1

## EXHIBIT "A"

## PROPERTY ADDRESS OF REAL ESTATE:

3350 Lions Den Road

Arnold, Missouri

## LEGAL DESCRIPTION OF REAL ESTATE

A tract of land in U.S. Survey 2970, and in fractional Section 3, Township 42 North, Range 5 East, Jefferson County, Missouri, and being more particularly described as follows:

Beginning at an old stone on the Southwest line of said U.S. Survey at the intersection of said Southwest line and the Southeast line of the land of Magdalena Lefarth, as recorded in Deed Book 731, Page 371, Jefferson County records; thence along said Southeast line North 47 degrees 29 minutes 53 seconds East 1754.07 feet; thence continuing along said Southeast line North 17 degrees 48 minutes 47 seconds East 59.53 feet to an iron rod (set); thence continuing along said Southeast line North 37 degrees 16 minutes 36 seconds East 15.91 feet to an old iron rod; thence continuing along said Southeast line North 50 degrees 26 minutes 23 seconds East 45.86 feet to an old iron rod; thence continuing along said Southeast line North 60 degrees 14 minutes 02 seconds East 27.54 feet; thence leaving said Southeast line and defining the parcel herein described South 52 degrees 16 minutes 17 seconds East 203.96 feet; thence on a tangent curve to the left having a radius of 25.00 feet, an arc distance of 36.32 feet to a point of reverse curvature; thence on a tangent curve to the right having a radius of 400.00 feet, an arc distance of 22.08 feet; thence North 47 degrees 38 minutes 54 seconds East 279.99 feet; thence on a tangent curve to the right having a radius of 400.00 feet, an arc distance of 68.91 feet; thence North 57 degrees 31 minutes 10 seconds East 206.83 feet to the Southwesterly line of Lions Den Road, as widened; thence along said Southwesterly line South 32 degrees 28 minutes 50 seconds East 25.78 feet to an iron rod (set); thence continuing along said Southwesterly line on a tangent curve to the right having a radius of 472.69 feet, an arc distance of 24.23 feet; thence leaving said Southwesterly line and defining the parcel herein described South 57 degrees 31 minutes 10 seconds West 206.21 feet; thence on a tangent curve to the left having a radius of 350.00 feet, an arc distance of 60.30 feet; thence South 47 degrees 38 minutes 54 seconds West 279.99 feet; thence on a tangent curve to the left having a radius of 350.00 feet, an arc distance of 93.07 feet; thence South 52 degrees 36 minutes 51 seconds East 675.85 feet; thence South 42 degrees 24 minutes 00 Seconds East 109.50 feet; thence North 47 degrees 36 minutes 00 seconds East 365.34 feet to the Southerly line of the land of Jefferson County, as recorded in Deed Book 908, Page 1408, Jefferson County Records; thence along said Southerly line North 80 degrees 28 minutes 13 seconds East 52.06 feet to an iron rod (set); thence continuing along said Southerly line North 73 degrees 54 minutes 39 seconds East 121.69 feet to an iron rod (set) on the Northwesterly line of the land of Alfred Barbagallo, et al., as recorded in Deed Book 712, Page 627, Jefferson County

WA 878331.1

Records; thence along said Northwesterly line South 47 degrees 31 minutes 15 seconds West 2183.75 feet to an old iron rod; thence continuing along said Northwesterly line South 46 degrees 48 minutes 03 seconds West 334.41 feet to an old stone on the aforesaid Southwest line of U. S. Survey 2970; thence along said Southwest line North 42 degrees 39 minutes 08 seconds West 869.74 feet to the Westerly line of aforesaid Alfred Barbagallo, et al.; thence along said Westerly line South 14 degrees 32 minutes 58 seconds West 536.88 feet to an iron rod (set on the East line of the Northwest Quarter of the Southwest Quarter of said Section 3; thence along said East line North 00 degrees 23 minutes 40 seconds East 257.23 feet to the centerline of a creek, as described as the Westerly line of the land of Jacob Blank as described in Deed Book 15, Page 172, Jefferson County Records; thence along said centerline South 18 degrees 13 minutes 12 seconds West 432.72 feet; thence continuing along said centerline South 03 degrees 36 minutes 57 seconds East 218.29 feet; thence continuing along said centerline South 25 degrees 16 minutes 11 seconds West 106.92 feet; thence continuing along said centerline South 13 degrees 06 minutes 21 seconds East 199.92 feet to the South line of the Northwest Quarter of the Southwest Quarter of said Section 3; thence along said South line North 89 degrees 32 minutes 53 seconds West 1230.85 feet to an old iron rod on the West line of said Section 3; thence along said West line North 00 degrees 23 minutes 34 seconds East 1342.38 feet to an old concrete monument at the West Quarter corner of said Section 3; thence along the North line of the Southwest Quarter of said Section 3, North 89 degrees 35 minutes 53 seconds East 308.43 feet to an old concrete monument on the Southeasterly line of the land of Lions Club South Side St. Louis, as recorded in Deed Book 382, Page 473, Jefferson County Records; thence along said Southeasterly line North 61 degrees 19 minutes 37 seconds East 442.20 feet to an old concrete monument; thence continuing along said Southeasterly line North 47 degrees 33 minutes 23 seconds East 131.65 feet to an old concrete monument; thence continuing along said Southeasterly line North 35 degrees 03 minutes 17 seconds East 198.48 feet to an old concrete monument on the aforesaid Southwest line of U. S. Survey 2970; thence along said Southwest line South 41 degrees 31 minutes 58 seconds East 601.89 feet to the point of beginning of this description.

WA 878331.1

# EXHIBIT D

SEP. 18. 2007　9:06AM　　ABN AMRO　　　　　　　　　NO. 5175　P. 2

# GUARANTY OF PAYMENT AND COMPLETION

This GUARANTY OF PAYMENT AND COMPLETION dated as of September 13, 2005 (this "Guaranty"), is executed by Keith Barket ("Guarantor"), to and for the benefit of LASALLE BANK NATIONAL ASSOCIATION, a national banking association (the "Lender").

## RECITALS:

A.　　The Lender has agreed to loan the principal amount of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) (the "Loan") to Paramont Properties, L.L.C., a Missouri limited liability company (the "Borrower") pursuant to the terms and conditions of that certain Promissory Note dated as of even date herewith (the "Note"). All terms not otherwise defined herein shall have the meanings set forth in the Note) between the Borrower and the Lender.

B.　　As a condition precedent to the Lender's extension of the Loan to the Borrower and in consideration therefor, the Lender has required the execution and delivery of (i) this Guaranty by the Guarantor, (ii) that certain Promissory Note dated even date herewith, executed by the Borrower and made payable to the order of the Lender (the "Note"), evidencing the Loan, (iii) that certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of even date herewith, executed by the Borrower to and for the benefit of the Lender (the "Mortgage") encumbering the real property, improvements and personality described therein (the "Premises"), and (iv) the other Loan Documents (as defined in the Note).

C.　　The Loan Proceeds will be used to develop certain improvements to the Premises (the "Project").

D.　　The Guarantor is the sole member of the Borrower and, having a financial interest in the Premises, has agreed to execute and deliver this Guaranty to the Lender.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Guarantor hereby agrees as follows:

## AGREEMENTS:

1.　　Guaranty of Payment. The Guarantor hereby unconditionally, absolutely and irrevocably guaranties to the Lender the punctual payment and performance when due, whether at stated maturity or by acceleration or otherwise, of the indebtedness and other obligations of the Borrower to the Lender evidenced by the Note and any other amounts that may become owing by the Borrower under the Loan Documents (such indebtedness, obligations and other amounts are hereinafter referred to as "Payment Obligations"). This Guaranty is a present and continuing guaranty of payment and not of collectibility, and the Lender shall not be required to prosecute collection, enforcement or other remedies against the Borrower or any other guarantor of the Payment Obligations, or to enforce or resort to any collateral for the repayment of the Payment Obligations or other rights or remedies pertaining thereto, before calling on the Guarantor for payment. If for any reason the Borrower shall fail or be unable to pay, punctually and fully, any of the Payment Obligations, the Guarantor shall pay such obligations to the Lender in full immediately upon demand. One or more successive actions may be brought against the Guarantor, as often as the Lender deems advisable, until all of the Payment Obligations are paid and performed in full. The Payment Obligations, together with all other payment and performance obligations of the Guarantor hereunder, are referred to herein as the "Obligations".

2.    Performance Guaranty.

(a)    The Guarantor absolutely, unconditionally and irrevocably undertakes and guarantees, for the benefit of the Lender and each and every present and future holder or holders of the Note or assignee or assignees of the Loan Documents, that all construction obligations of the Borrower for completion of the Project in accordance with the Plans and Specifications (as herein defined), the Loan Documents and other performance obligations of the Borrower under the Loan Documents (referred to herein as the "Construction Obligations") shall be diligently pursued and completed in accordance with the other terms and conditions contained in the Loan Documents, free and clear of any and all liens, charges, security interests and claims of any kind and nature whatsoever. The Guarantor shall cause the Construction Obligations to be performed, completed and paid for in the manner and at the applicable times required to be so performed, completed and paid for by the Borrower under the Note, to the extent that the Borrower fails to do so at any and all applicable times. As used herein, the term "Plans and Specifications" means a detailed budget for completion of the Project and a plat for the Premises as improved the Project.

(b)    Upon the occurrence of an Event of Default by the Borrower under the Loan Documents, the Guarantor agrees, on not more than fifteen (15) days written demand by the Lender (a "Demand Notice") to commence performance of the Construction Obligations and to diligently pursue performance thereof to completion, as described below. The Guarantor shall indemnify, defend and hold the Lender harmless from and against any and all loss, damage, cost, expense, injury or liability the Lender may suffer or incur in connection with third party claims brought as a result of the performance of the Construction Obligations by the Guarantor. If the Guarantor fails to commence and pursue diligently the performance of the Construction Obligations within fifteen (15) days after its receipt of a Demand Notice, then, either before or after pursuing any other remedy of the Lender against the Guarantor or the Borrower and regardless of whether the Lender shall ever pursue any such other remedy, the Lender shall have the right to complete the Construction Obligations, or call upon any other reputable parties to complete the Construction Obligations, in accordance with the Plans and Specifications (as may be modified in accordance with the terms of the Loan Documents) and shall have the right to expend such sums as the Lender in its discretion deems proper in order so to complete the Construction Obligations. During the course of any construction undertaken by the Lender or by any other party on behalf of the Lender, the Guarantor shall pay on demand any amounts due to any contractor, subcontractor and other material suppliers and for permits and licenses necessary to complete the Construction Obligations, without regard to any limitation on liability set forth herein. The Lender at any time may require the Guarantor to perform or supervise the performance of such work in lieu of the Lender or any party engaged by the Lender. The obligations of the Guarantor in connection with such work shall not be affected by any errors or omissions of the Borrower, the contractor, any subcontractor, or any agent or employee of any of them in design, supervision or performance of the work, it being understood that such risk is assumed by the Guarantor. Neither the completion of the Construction Obligations nor failure of said parties to complete the Construction Obligations shall relieve the Guarantor of any liabilities hereunder; rather, such liability shall be continuing, except as otherwise provided herein, and may be enforced by the Lender to the end that the Construction Obligations shall be completed timely as contemplated by the Loan Documents and the Plans and Specifications, free of any liens, and without loss, expense, injury or liability of any kind to the Lender.

(c)    For purposes of this Section 2, the Construction Obligations shall be deemed to be completed upon receipt by the Lender of (i) completion of the Project and (ii) construction date-down and interim mechanics' lien endorsements to the Title Policy, insuring the continuing validity and priority of the Mortgage for the full amount of the Loan theretofore disbursed, excepting only such items as shall be permitted under the Loan

2                                        WA 804975-1

SEP. 18. 2007   9:07AM      ABN AMRO                      NO. 5179   P. 4

Documents, and insuring over mechanics' and materialmen's liens arising (or which may arise) from work performed and materials supplied in connection with the construction of the Construction Obligations prior to the date of satisfaction of the conditions described in clause (i) above.

3.     Representations and Warranties.  The following shall constitute representations and warranties of the Guarantor, and the Guarantor hereby acknowledges that the Lender intends to make the Loan in reliance thereon:

(a)     Guarantor is not in default, and no event has occurred which, with the passage of time and/or the giving of notice, would constitute a default, under any agreement to which any Guarantor is a party, the effect of which will impair performance by such Guarantor of his obligations under this Guaranty. Neither the execution and delivery of this Guaranty nor compliance with the terms and provisions hereof will violate any applicable law, rule, regulation, judgment, decree or order, or will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind that creates, represents, evidences or provides for any lien, charge or encumbrance upon any of the property or assets of the Guarantor, or any other indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which the Guarantor is a party or to which Guarantor or the property of Guarantor may be subject.

(b)     There are no litigation, arbitration, governmental or administrative proceedings, actions, examinations, claims or demands pending, or to the knowledge of the Guarantor, threatened that could adversely affect performance by Guarantor of his obligations under this Guaranty.

(c)     Neither this Guaranty nor any statement or certification as to facts previously furnished or required herein to be furnished to the Lender by the Guarantor, contains any material inaccuracy or untruth in any representation, covenant or warranty or omits to state a fact material to this Guaranty.

4.     Continuing Guaranty.  The Guarantor agrees that the performance of the Obligations by the Guarantor shall be a primary obligation, shall not be subject to any counterclaim, set-off, abatement, deferment or defense based upon any claim that the Guarantor may have against the Lender, the Borrower, any other guarantor of the Obligations or any other person or entity, and shall remain in full force and effect without regard to, and shall not be released, discharged or affected in any way by, any circumstance or condition (whether or not the Guarantor shall have any knowledge thereof), including without limitation:

(a)     any lack of validity or enforceability of any of the Loan Documents;

(b)     any termination, amendment, modification or other change in any of the Loan Documents, including, without limitation, any modification of the interest rate(s) described therein;

(c)     any furnishing, exchange, substitution or release of any collateral securing repayment of the Loan, or any failure to perfect any lien in such collateral;

(d)     any failure, omission or delay on the part of the Borrower, the Guarantor, any other guarantor of the Obligations or the Lender to conform or comply with any term of any of the Loan Documents or any failure of the Lender to give notice of any Event of Default (as defined in the Note);

WA 804975-1

(e) any waiver, compromise, release, settlement or extension of time of payment or performance or observance of any of the obligations or agreements contained in any of the Loan Documents;

(f) any action or inaction by the Lender under or in respect of any of the Loan Documents, any failure, lack of diligence, omission or delay on the part of the Lender to perfect, enforce, assert or exercise any lien, security interest, right, power or remedy conferred on it in any of the Loan Documents, or any other action or inaction on the part of the Lender;

(g) any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshalling of assets and liabilities or similar events or proceedings with respect to the Borrower, the Guarantor or any other guarantor of the Obligations, as applicable, or any of their respective property or creditors, or any action taken by any trustee or receiver or by any court in any such proceeding;

(h) any merger or consolidation of the Borrower into or with any entity, or any sale, lease or transfer of any of the assets of the Borrower, the Guarantor or any other guarantor of the Obligations to any other person or entity;

(i) any change in the ownership of the Borrower or any change in the relationship between the Borrower, the Guarantor or any other guarantor of the Obligations, or any termination of any such relationship;

(j) any release or discharge by operation of law of the Borrower, the Guarantor or any other guarantor of the Obligations from any obligation or agreement contained in any of the Loan Documents; or

(k) any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing and whether foreseen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which otherwise might limit recourse against the Borrower or the Guarantor to the fullest extent permitted by law.

5.    Waivers. The Guarantor expressly and unconditionally waives (i) notice of any of the matters referred to in Section 3 above, (ii) all notices which may be required by statute, rule of law or otherwise, now or hereafter in effect, to preserve intact any rights against the Guarantor, including, without limitation, any demand, presentment and protest, proof of notice of non-payment under any of the Loan Documents and notice of any Event of Default or any failure on the part of the Borrower, the Guarantor or any other guarantor of the Obligations to perform or comply with any covenant, agreement, term or condition of any of the Loan Documents, (iii) any right to the enforcement, assertion or exercise against the Borrower, the Guarantor or any other guarantor of the Obligations of any right or remedy conferred under any of the Loan Documents, (iv) any requirement of diligence on the part of any person or entity, (v) any requirement on the part of the Lender to exhaust any remedies or to mitigate the damages resulting from any default under any of the Loan Documents, and (vi) any notice of any sale, transfer or other disposition of any right, title or interest of the Lender under any of the Loan Documents.

6.    Subordination. The Guarantor agrees that any and all present and future debts and obligations of the Borrower to the Guarantor are hereby subordinated to the claims of the Lender and are hereby assigned by the Guarantor to the Lender as security for the Obligations and the obligations of the Guarantor under this Guaranty.

4

SEP. 18. 2007  9:08AM    ABN AMRO                          NO. 5175   P. 8

7.    Subrogation Waiver.  Until the Obligations are paid in full and all periods under applicable bankruptcy law for the contest of any payment by the Guarantor or the Borrower as a preferential or fraudulent payment have expired, the Guarantor knowingly, and with advice of counsel, waives, relinquishes, releases and abandons all rights and claims to indemnification, contribution, reimbursement, subrogation and payment which the Guarantor may now or hereafter have by and from the Borrower and the successors and assigns of the Borrower, for any payments made by the Guarantor to the Lender, including, without limitation, any rights which might allow the Borrower, the Borrower's successors, a creditor of the Borrower, or a trustee in bankruptcy of the Borrower to claim in bankruptcy or any other similar proceedings that any payment made by the Borrower or the Borrower's successors and assigns to the Lender was on behalf of or for the benefit of the Guarantor and that such payment is recoverable by the Borrower, a creditor or trustee in bankruptcy of the Borrower as a preferential payment, fraudulent conveyance, payment of an insider or any other classification of payment which may otherwise be recoverable from the Lender.

8.    Reinstatement.  The obligations of the Guarantor pursuant to this Guaranty shall continue to be effective or automatically be reinstated, as the case may be, if at any time payment of any of the Obligations or the obligations of the Guarantor under this Guaranty is rescinded or otherwise must be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Guarantor or the Borrower or otherwise, all as though such payment had not been made.

9.    Financial Statements.  The Guarantor represents and warrants to the Lender that (a) the financial statements of Guarantor previously submitted to the Lender are true, complete and correct in all material respects, disclose all actual and contingent liabilities, and fairly present the financial condition of Guarantor, and do not contain any untrue statement of a material fact or omit to state a fact material to the financial statements submitted or this Guaranty, and (b) no material adverse change has occurred in the financial statements from the dates thereof until the date hereof. The Guarantor shall furnish to the Lender annual financial statements for each calendar year no later than ninety (90) days after the end of such years certified by Guarantor as true, complete and correct and otherwise in a form substantially similar to the form of financial statements previously submitted by Guarantor to the Lender, unless otherwise approved in writing by the Lender.

10.    Transfers; Sales, Etc.  The Guarantor shall not sell, lease, transfer, convey or assign any of his assets, unless (a) if such Guarantor is an individual, such sale, lease, transfer, conveyance or assignment is of a non-material asset of such Guarantor, or (b) if such Guarantor is a corporation, partnership or other entity, such sale, lease, transfer, conveyance or assignment is performed in the ordinary course of its business consistent with past practices, and will not have a material adverse effect on the business or financial condition of such Guarantor or its ability to perform its obligations hereunder. In addition, such Guarantor shall neither become a party to any merger or consolidation, nor, except in the ordinary course of its business consistent with past practices, acquire all or substantially all of the assets of, a controlling interest in the stock of, or a partnership or joint venture interest in, any other entity.

11.    Enforcement Costs.  If:  (a) this Guaranty, is placed in the hands of one or more attorneys for collection or is collected through any legal proceeding; (b) one or more attorneys is retained to represent the Lender in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this Guaranty, or (c) one or more attorneys is retained to represent the Lender in any other proceedings whatsoever in connection with this Guaranty, then the Guarantor shall pay to the Lender upon demand all fees, costs and expenses incurred by the Lender in connection therewith, including, without limitation, reasonable attorney's fees, court costs and filing fees (all of which are referred to herein as the "Enforcement Costs"), in addition to all other amounts due hereunder.

WA 804975-1

SEP. 18. 2007  9:09AM    ABN AMRO

12.   <u>Successors and Assigns; Joint and Several Liability</u>. This Guaranty shall inure to the benefit of the Lender and its successors and assigns. This Guaranty shall be binding on the Guarantor and his heirs, legatees, devisees and assigns. The Guarantor agrees and acknowledges that the liability of the Guarantor hereunder is independent of any other guarantees or other obligations at any time in effect with respect to the Obligations or any part thereof, and that the liability of the Guarantor hereunder may be enforced regardless of the existence, validity, enforcement or non-enforcement of any such other guarantees or other obligations.

13.   <u>No Waiver of Rights</u>. No delay or failure on the part of the Lender to exercise any right, power or privilege under this Guaranty or any of the other Loan Documents shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege shall preclude any other or further exercise thereof or the exercise of any other power or right, or be deemed to establish a custom or course of dealing or performance between the parties hereto. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law. No notice to or demand on the Guarantor in any case shall entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

14.   <u>Modification</u>. The terms of this Guaranty may be waived, discharged, or terminated only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought. No amendment, modification, waiver or other change of any of the terms of this Guaranty shall be effective without the prior written consent of the Lender.

15.   <u>Joinder</u>. Any action to enforce this Guaranty may be brought against the Guarantor without any reimbursement or joinder of the Borrower, or any other guarantor of the Obligations in such action.

16.   <u>Severability</u>. If any provision of this Guaranty is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, the Guarantor and the Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this Guaranty and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

17.   <u>Applicable Law</u>. This Guaranty is governed as to validity, interpretation, effect and in all other respects by laws and decisions of the State of Illinois.

18.   <u>Notices</u>. All notices, communications and waivers under this Guaranty shall be in writing and shall be (a) delivered in person, (b) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (c) by overnight express carrier, addressed in each case as follows:

<table>
<tr><td>To the Lender:</td><td>LaSalle Bank National Association<br>135 South LaSalle Street, Suite 1225<br>Chicago, Illinois  60603<br>Attention: Commercial Real Estate Division<br>Karen Case, GSVP</td></tr>
<tr><td>AND</td><td>LaSalle Bank National Association<br>1 North Brentwood Boulevard, Suite 950<br>St. Louis, Missouri  63105<br>Attention: Commercial Real Estate Division<br>Robert Binsbacher</td></tr>
</table>

6

SEP. 18. 2007   9:09AM    ABN AMRO

With a copy to:                    Spencer Fane Britt & Browne LLP
                                   1 North Brentwood Blvd., Suite 1000
                                   St. Louis, Missouri 63105-3925
                                   Attention:  James R. Dankenbring, Esq.

To the Guarantor:                  Keith Barket
                                   c/o Paramont Properties, L.L.C.
                                   705 Olive St., 4th Floor
                                   St. Louis, Missouri  63101

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other parties hereto.  All notices sent pursuant to the terms of this Section shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, or (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

19.    CONSENT TO JURISDICTION.  TO INDUCE THE LENDER TO ACCEPT THIS GUARANTY, THE GUARANTOR IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS GUARANTY WILL BE LITIGATED IN COURTS HAVING SITUS IN CHICAGO, ILLINOIS.  THE GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CHICAGO, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE GUARANTOR AT THE ADDRESSES STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

20.    WAIVER OF DEFENSES.  OTHER THAN CLAIMS BASED UPON THE FAILURE OF THE LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, THE GUARANTOR WAIVES EVERY PRESENT AND FUTURE DEFENSE (OTHER THAN THE DEFENSE OF PAYMENT IN FULL), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE GUARANTOR OR THE BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY LENDER IN ENFORCING THIS GUARANTY OR ANY OF THE LOAN DOCUMENTS.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER.

21.    WAIVER OF JURY TRIAL.  THE GUARANTOR AND THE LENDER (BY ACCEPTANCE HEREOF), HAVING BEEN REPRESENTED BY COUNSEL, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS GUARANTY OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  THE GUARANTOR AGREES THAT GUARANTOR WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

22.    Counterparts; Facsimile Signatures.  This Guaranty may be executed in any number of counterparts, all of which shall be taken to be one and the same instrument, for the same effect as

7                                                              WA 804975-1

if all parties hereto had signed the same signature page. Receipt of an executed signature page to this Guaranty by facsimile or other electronic transmission shall constitute effective delivery thereof.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the date first above written.

Name: Keith Barket

8

WA 804975-1