UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LaSALLE BANK NATIONAL ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-02081 |
| | ) | |
| PARAMONT PROPERTIES, L.L.C. and KEITH BARKET, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER AND COUNTERCLAIMS

COME NOW Defendants Paramont Properties, L.L.C. ("Paramont") and Keith

Barket ("Barket") and state as follows:

## ANSWER

1.      Defendants are without sufficient information or knowledge to admit or

deny the allegations of paragraph 1 and, therefore, deny the same.

2.      Defendants admit the allegation contained in paragraph 2 of Plaintiff's

Complaint.

3.      Defendants admit the allegations contained in paragraph 3 of Plaintiff's

Complaint.

4.      Defendants admit the allegations of paragraph 4.

5.      Defendants deny the allegations contained in paragraph 5.

6.      Defendants deny the allegations contained in paragraph 6.

## Count I

7.      Defendants incorporate and re-allege by reference paragraphs 1-6 of their

(AnswerandCounterclaims-6-11-08.doc)

Answer as if fully stated herein.

8.      Defendants admit the allegations of paragraph 8.

9.      Defendants admit the genuineness of the promissory note attached as Exhibit A, but state that the terms and conditions of the note speak for themselves and, therefore, Defendants deny Plaintiff's characterization thereof.

10.     Defendants admit the genuineness of the Modification of Promissory Note and Deed of Trust, Security Agreement, Fixture and Filing and Assignment of Leases and Rents is attached to Plaintiff's Complaint as Exhibit B, but state that the terms and conditions of the document note speak for themselves and, therefore, Defendants deny Plaintiff's characterization thereof.

11.     Defendants admit the genuineness of the Modification of Promissory Note and Deed of Trust, Security Agreement, Fixture and Filing and Assignment of Leases and Rents is attached to Plaintiff's Complaint as Exhibit C, but state that the terms and conditions of the document note speak for themselves and, therefore, Defendants deny Plaintiff's characterization thereof.

12.     Defendants state that the loan documents speak for themselves, and therefore deny Plaintiff's characterization thereof contained in paragraph 12.

13.     Defendants cannot admit or deny the allegation as written because it refers in the singular to a series of transactions and also incorporates the state of mind of the Plaintiff. To the extent that any response is required, Defendants deny the allegations.

14.     Defendants state that the loan documents and subsequent modifications speak for themselves and therefore deny Plaintiff's characterization of same in paragraph 14.

15.     Defendants state that the loan documents and subsequent modifications

speak for themselves and therefore deny Plaintiff's characterization of same in paragraph 15.

16.     Defendants state that the promissory note speaks for itself and deny Plaintiff's characterization thereof in paragraph 16.

17.     Defendants state that the promissory note speaks for itself and deny Plaintiff's characterization thereof in paragraph 17.

18.     Defendants state that the promissory note speaks for itself and deny Plaintiff's characterization thereof in paragraph 18.

19.     Defendants admit the allegation contained in paragraph 19.

20.     Defendants admit that Paramont failed to pay LaSalle the interest demanded, but denies that the interest was due or that Paramont's failure to pay the interest constituted a default event for the reasons set forth in Defendants' counterclaims.

21.     Defendants admit that counsel for LaSalle sent a September 24, 2007 letter letter to Paramont and that thereafter Paramont did not pay the interest demanded.  Defendants deny the remaining allegations of paragraph 21 not specifically admitted.

22.     Defendants admit that Paramont failed to pay LaSalle the interest demanded, but denies that the interest was due or that Paramont's failure to pay the interest constituted a default event for the reasons set forth in Defendants' counterclaims.

23.     Defendants admit that counsel for LaSalle sent Paramont a letter on October 22, 2007 stating that Paramont was in default of its obligations, but deny the remaining allegations of paragraph 23.

24.     Defendants admit that Plaintiff's counsel sent Paramont a letter on October 22, 2007 informing Paramont that LaSalle was exercising its right to accelerate the loan and demanding immediate payment of the outstanding balance and interest.

25.    Defendants admit that defendants have not paid various amounts demanded by Plaintiff, but deny that such amounts were due or owing.

26.    Defendants deny the allegations contained in paragraph 26.

27.    Defendants state that the promissory note speaks for itself and therefore deny Plaintiff's characterization thereof in paragraph 27.

28.    Defendants deny the allegations in paragraph 28.

### Count II

29.    Defendants incorporate and re-allege by reference paragraphs 1-28 of their Answer as if fully stated herein.

30.    Defendants admit the genuineness of the Guaranty attached as Exhibit D, but state that the terms of the Guaranty speak for themselves and, therefore, Defendants deny Plaintiff's characterization thereof.

31.    Defendants admit that Plaintiff has made demand upon Barket and that Barket has refused payment, but deny each and every other allegation not specifically admitted.

32.    Defendants deny the allegations in paragraph 32.

33.    Defendants state that the promissory note speaks for itself and therefore deny Plaintiff's characterization thereof in paragraph 33.

34.    Defendants deny the allegations in paragraph 34.

**FURTHER ANSWERING** and as an affirmative defense to Plaintiff's Complaint, Defendants state that Plaintiffs Complaint fails to state a claim upon which relief can be granted.

**FURTHER ANSWERING** and as an affirmative defense to Plaintiff's Complaint, Defendants state that Defendants are entitled to set-off against any amounts allegedly

owed under the loan as a result diminution of value of the project and for other damages as set out more fully in Defendants' Counterclaims.

**FURTHER ANSWERING** and as an affirmative defense to Plaintiff's Complaint, Defendants state that Plaintiff failed to mitigate its damages as set forth in Defendants' Counterclaims.

**FURTHER ANSWERING** and as an affirmative defense to Plaintiff's Complaint, Defendants state that Plaintiff's Complaint is barred by LaSalle's breach of its obligations under the contract and breach of its implied duty of good faith and fair dealing as set forth in Defendants' Counterclaims.

**FURTHER ANSWERING** and as an affirmative defense to Plaintiff's Complaint, Defendants state that Defendant Keith Barket's Guaranty is not enforceable for the reasons set forth in Defendants' Counterclaims.

**FURTHER ANSWERING** and as an affirmative defense to Plaintiff's Complaint, Defendants state that Plaintiff's is estopped from recovering for the reasons set forth in Defendants' Counterclaims.

WHEREFORE, having fully answered Plaintiff's Complaint, Defendants pray for an Order dismissing Plaintiff's Complaint and denying the relief requested, finding in favor of the Defendants for their attorneys fees and costs and for such additional relief as the Court deems just and proper.

## COUNTERCLAIMS

COME NOW Defendants Paramont Properties, L.L.C. and Keith Barket ("Barket") and state as follows:

### The Parties

1.      Defendant Paramont Properties, L.L.C. ("Paramont") is a Missouri limited liability company.  Defendant Keith Barket is the managing member of Paramont.

2.      Plaintiff LaSalle Bank National Association ("Bank") is a national banking association with its principal place of business in St. Louis County, Missouri.  Upon information and belief, by at least 2004, Bank was actively marketing itself in the banking community as a prospect for acquisition or merger and, in order to make itself a more attractive candidate, Bank aggressively pursued lending opportunities in the St. Louis real estate market.

### The Amberleigh Woods Project

3.      Paramont is the owner of certain real estate located in Jefferson County commonly known as Amberleigh Woods.  In September 2005, Paramont acquired Amberleigh Woods for the purpose of subdividing and developing the property into a 224 lot single family residential subdivision.  As originally conceived, Paramont contemplated a two phased development of Amberleigh Woods, with Phase I to include 110 lots and Phase II to include 114 lots.

4.      On December 12, 2005, Paramont entered into a Development and Sale Agreement with Arch Land Development, LLC, under which Arch agreed to construct the infrastructure and improvements necessary to complete the Amberleigh Woods development and to ready it for the sale of lots to third party homebuilders.  Arch was and is managed by Larry Labrier ("Labrier"), an individual residing in St. Louis County, Missouri.

**The LaSalle Loan**

5.       On September 13, 2005, Bank agreed to establish a line of credit in favor of Paramont with a maximum commitment of $6,500,00 to acquire the real estate and finance the development of the Amberleigh Woods subdivision.  In connection with that agreement, Paramont executed a Promissory Note in favor of Bank, a copy of which is attached as <u>Exhibit A</u> ("Note") to Plaintiff's Complaint.  Keith Barket executed a personal guaranty of the Note, a copy of which is attached as <u>Exhibit D</u> to Plaintiff's Complaint.

6.       The Note authorized Bank to advance funds upon written requests "which the Lender in good faith believes to emanate from a properly authorized representative of [Paramont]" (Note, ¶2.2(a)), provided

> (e)      At least ten (10) Business Days prior to, and as a condition of, each Advance, Borrower shall furnish to Lender the following documents covering such Advance:
>
>> (i)      Borrower's disbursement request (a "<u>Request For Advance</u>" in the form of "<u>Exhibit A</u>" attached hereto, which shall, among other things specify the amount of the requested Advance (exclusive of interest); direct the Lender to disburse such funds in accordance with this Note….

(Note, ¶2.2(e)).  The Request For Advance acknowledged that Bank's approval of construction disbursements was subject to, among other things, "inspection of the Project" (Note, Ex. A).

7.       The Note acknowledged the proposed two phase construction of the Amberleigh Woods subdivision and stated "Notwithstanding anything in this Note to the contrary, no Advance shall be made hereunder for the purpose of improvements to that part of the Land within Phase II until sixty percent (60%) of the lots in Phase I are sold" (Note, ¶2.3).

8.       After the Bank had already disbursed $160,500 to Paramont, the Bank engaged U.S. Title to act as Bank's escrow agent for purposes of processing Advances under the

Note and Bank, Paramont, Arch Land and U.S. Title executed a Construction Loan Escrow

Agreement on January 17, 2006, a copy of which is attached as **Exhibit A**.

      9.     At the request of the Bank, the Escrow Agreement provided:

         39.    That the following is the schedule of amount [sic] to be paid hereunder to Escrowee and that [sic] the purposes for which disbursement shall be made by Escrowee:

         \*      \*      \*

| CONSTRUCTION CONTRACT AMOUNT PHASE 1 | $1,740,255.00 |
| COSNTRUCTION CONTRACT AMOUNT PHASE 2 | $2,934,245.00 |
| TOTAL CONSTRUCTION COSTS | $4,680,375.00 |

      10.    In a February 2006 Modification and December 2006 Second

Modification to the Note, the Bank increased the maximum commitment under the Note to

$7,000,000 and then $8,500,000 respectively.

### The Bank's Improper Loan Administration

      11.    In making the loan to Paramont, the Bank disregarded its internal lending

guidelines. Thereafter, in making Advances under the Note, the Bank disregarded the terms of

the Note, disregarded the language of the Escrow Agreement and ignored obvious warning signs

that the Amberleigh Woods project was being mismanaged into cost overruns by Arch Land and

Labrier, including without limitation:

      (a)    The Bank concluded the loan with a 92% loan to value ratio--well in excess of that called for under its lending guidelines;

      (b)    The Bank and/or its escrow agent allowed Advances without the express authorization of Paramont and which were approved only by Larry Labrier and other agents of Arch Land, an interested party who depended upon the Advances for payment of its contractor fees;

      (c)    The Bank and/or its escrow agent relied

upon Larry Labrier to provide the Bank with project budgets and projections that the Bank knew, or should have known were fatally flawed and internally inconsistent;

(d)     The Bank did not insist that Labrier support his budgets or his changes to the budgets with competitive bids;

(e)     In the case of every draw request, the Bank ignored the requirement under the Note that Paramont request Advances and that those requests be made pursuant to a Request For Advance under the Note;

(f)     The Bank and/or its escrow agent made Phase I Advances through project draw request 6 based upon a project budget prepared by Larry Labrier that did not differentiate between Phase I and Phase II costs;

(g)     The Bank failed to inspect the progress of construction despite receiving reports of actual or projected overruns;

(h)     The Bank and/or its escrow agent continued to make Phase I Advances from and after project draw request 7 even though Labrier's Phase I budget shown on those requests was more than double that authorized by the Escrow Agreement and, if correct, would have had the effect of reducing the funds allocated to Phase II in the Escrow Agreement ($2,934,245) by more than $1,000,000;

(i)     Between August 14, 2006 and September 29, 2006, the Bank permitted the "balance to draw" under the Note to be increased by $434,830.51 based solely upon unsupported (and unchallenged by the Bank) cost increases submitted by Labrier;

(j)     The Bank and/or its escrow agent continued to make Advances even though Labrier's budgets demonstrated that Phase I was experiencing overruns that would require the expenditure of funds reserved for Phase II under any circumstances and even though the proposed sale of Phase I lots to a third party did not close;

(k)     The Bank and/or its escrow agent continued to make Advances even though the Advances for Phase I had exceeded the Phase I budget set forth in the Escrow Agreement by the time of draw request number 8.

12.    The Bank's cavalier disregard for its lending guidelines, the controlling terms of the relevant agreements and prudent lending practice was, upon information and belief, motivated by the Bank's desire to improve its loan portfolio and, therefore, its "salability" for prospective merger or acquisition suitors.  The Bank's course of conduct—in particular the Bank's (i) disregard for the Phase I budget established in the Escrow Agreement, (ii) tolerance of dramatic budget increases and project overruns, (iii) continued disbursement after Phase I failed to close in amounts well in excess of the Phase I budget and (iv) history of loan increases in the Modification Agreements—led Paramont to believe that the Bank would permit draws to fund Phase II improvements without any pre-sale of Phase I lots as required under the Note and that the Bank would enter into further loan modifications to permit such Phase II draws if necessary.

13.    In fact, as Paramont's construction draws approached the maximum commitment under the Note, the Bank assured Paramont that the Bank would increase its maximum commitment to cover overruns and some, if not all, of the Phase II costs.  With respect to the coverage for Phase II, the Bank indicated that the level of its additional commitment would be determined in part by the results of an appraisal of the development.  Upon information and belief, the Bank engaged a real estate appraiser.  Paramont has requested, but has not received, a copy of the appraisal.

14.    The Bank continued to promised its ongoing cooperation with Paramont through the Fall of 2007.  At that time, upon information and belief, the Bank had made substantial progress in its ongoing merger discussions with Bank of America.  The Bank advised Paramont that all future decisions relating to Paramont's loan would be made by the Bank's Chicago office instead of the Bank's St. Louis office that historically handled the loan due to the fact that Keith Barket's son in law held a significant position with Bank of America.

15.     The Bank thereafter refused to disburse funds to pay carrying charges for the month of September 2007, although it was obligated to do so under the terms of the Note, until Paramont's counsel made written demand coupled with a revocation of Barket's Guaranty, a copy of which is attached as **Exhibit B.**

16.     The Bank has now refused to extend further credit to pay cost overruns or Phase II construction costs as Paramont reasonably expected it would, resulting in the filing of mechanics' liens and other claims relating to the Amberleigh Woods project and diminishing the fair market value of the project.

## COUNT I

## NEGLIGENCE

17.     Defendants re-allege the allegations of paragraphs 1-16 of their Counterclaim.

18.     The Bank owed a duty to administer the Paramont loan with the same degree of care, skill and learning that an ordinarily careful lender would use under the same or similar circumstances.

19.     The Bank breached its duty of care and was therefore negligent for the reasons set forth in paragraphs 11(a)-(k) through 15.

20.     Defendants were damaged as a direct result of the Bank's negligence by the diminution of value of the Amberleigh Woods project, Paramont's withdrawal of construction funds that could have or should have been avoided had the Bank either advised Paramont of ongoing discrepancies with the materials being provided by Labrier, Paramont's withdrawal of construction funds that could have or should have been avoided had Paramont known that the Bank would not extend Paramont credit for cost overruns or Phase II costs and

other damages, all in excess of $25,000.

## COUNT II

## GOOD FAITH AND FAIR DEALING

21.    Defendants re-allege the allegations of paragraphs 1-20 of their Counterclaim.

22.    The Bank assumed the implied duty of good faith and fair dealing in and related to the Note, and the subsequent modifications of the Note, and the Guaranty.

23.    The Bank breached its implied duty for the reasons set forth in paragraphs 11(a)-(k) through 15.

24.    Defendants were damaged as a direct result of the Bank's breach by the diminution of value of the Amberleigh Woods project, Paramont's withdrawal of construction funds that could have or should have been avoided had the Bank either advised Paramont of ongoing discrepancies with the materials being provided by Labrier, Paramont's withdrawal of construction funds that could have or should have been avoided had Paramont known that the Bank would not extend Paramont credit for cost overruns or Phase II costs and other damages, all in excess of $25,000.

## COUNT III

## NEGLIGENT MISREPRESENTATION

25.    Defendants re-allege the allegations of paragraphs 1-24.

26.    As set forth in paragraphs 13 and 14, the Bank represented that it would extend additional funds to Paramont sufficient to cover historical and anticipated cost overruns and some or all of the Phase II construction.

27.    The Bank made those representations (a) for the purpose of advancing

their own commercial interests (namely, to induce Paramont to draw additional funds and to continue to pay interest carry in the ordinary course on all funds drawn) and (b) when they knew or should have known that the representations were false.

28.     Defendants were damaged as a direct result of the Bank's misrepresentations by the diminution of value of the Amberleigh Woods project, Paramont's withdrawal of construction funds that could have or should have been avoided had the Bank either advised Paramont of ongoing discrepancies with the materials being provided by Labrier, Paramont's withdrawal of construction funds that could have or should have been avoided had Paramont known that the Bank would not extend Paramont credit for cost overruns or Phase II costs and other damages, all in excess of $25,000.

29.     The Bank made the representations with malice and with conscious disregard for the known rights of Defendants such that Defendants are entitled to an award of punitive damages.

## COUNT IV

## BREACH OF CONTRACT

30.     Defendants re-allege the allegations of paragraphs 1-16.

31.     The Bank breached its obligations under the Note, as modified, by (i) failing to insist upon properly executed Requests For Payment as a condition to construction draws, (ii) failing to make inspections of the progress of construction, (iii) allowing construction draws without the written approval of Paramont; and (iv) refusing to allow additional draws to cover cost overruns and Phase II costs.

32.     Defendants were damaged as a direct result of the Bank's breach by the diminution of value of the Amberleigh Woods project, Paramont's withdrawal of construction

funds that could have or should have been avoided had the Bank either advised Paramont of ongoing discrepancies with the materials being provided by Labrier, Paramont's withdrawal of construction funds that could have or should have been avoided had Paramont known that the Bank would not extend Paramont credit for cost overruns or Phase II costs and other damages, all in excess of $25,000.

## COUNT V

## DECLARATORY JUDGMENT

33.     Defendants re-allege the allegations of paragraphs 1-32.

34.     There exists a genuine and existing controversy between Keith Barket and the Bank as to whether Barket properly revoked his Guaranty and whether the Guaranty is, in any event, enforceable in light of the Bank's improper administration of the Note and misrepresentations set forth above.

## REQUESTS FOR RELIEF

WHEREFORE, Defendants request that the Court:

A.     Award Defendants their actual damages in an amount to be proved at trial, but in excess of $25,000;

B.     Award Defendants punitive damages;

C.     Enter a Declaratory Judgment that Keith Barket's Guaranty is null, void and of no further force and effect;

D.     Award Defendants their costs, fees, interest and such other relief as the Court deems proper.

STONE, LEYTON & GERSHMAN,
A PROFESSIONAL CORPORATION


By: /s/  Paul J. Puricelli
       Paul J. Puricelli, *pro hac vice*
       7733 Forsyth Boulevard, Suite 500
       St. Louis, Missouri 63105
       (314) 721-7011 (Telephone)
       (314) 721-8660 (Telecopy)
       *ppuricelli@stoneleyton.com*
       *Attorneys for Defendants/Counterclaimants*


BEST, VANDERLAAN & HARRINGTON
Michael A. Wax, Esq.
25 East Washington, Suite 210
Chicago, IL 60602

FISHER KANARIS, P.C.
Peter E. Kanaris, Esq.
200 South Wacker Drive, 22nd Floor
Chicago, IL 60606


## CERTIFICATE OF SERVICE

The foregoing was filed with the Clerk of Court on the 13th day of June, 2008, and served

by operation of the Court's electronic filing system on the following:

       Michael W. Bartolacci, Esq.
       Thompson Coburn LLP
       One US Bank Plaza
       St. Louis, MO 63101

       Todd A. Rowden, Esq.
       Scott P. Clair, Esq.
       Thompson Coburn LLP
       55 E Monroe St., 40th Floor
       Chicago, IL 60603


       /s/ Paul J. Puricelli

Abstract #: 525807

**U.S. TITLE**
**8137 FORSYTH**
**CLAYTON, MO 63105**

## CONSTRUCTION LOAN ESCROW AGREEMENT

Arch Land Development L.L.C., hereinafter called "Contractor",

Paramount Properties, L.L.C., hereinafter called "Owner",

LaSalle Bank, hereinafter called "Lender",

and

U.S. TITLE, hereinafter "Escrowee", agree that the amount deposited with Escrowee, as shown in the Schedules under paragraph 39, shall be held by Escrowee for use in payment for labor, materials, services, and all other items included in said Schedule, all relating to the property described below and the construction of improvements thereon as detailed in plans and specifications identified by the parties and deposited with Escrowee. Neither Owner nor Contractor shall have any rights to any of said funds except as hereinafter provided ownership of funds being in Escrowee for the purpose herein. The property upon which said improvements will be constructed being in the County of * State of MISSOURI and is described as follows, to-wit:

Amberleigh Woods

**CONTRACTOR COVENANTS AND AGREES:**

1.   To fully construct and complete the improvements on or before July, 2007 in a first-class, workmanlike manner according to construction contract, plans and specifications for the contract amount, as shown in Schedule under paragraph 39, with all claims for labor and materials paid in full, free and clear from mechanics and materialmens' liens, furnishing lien waivers, paid bills and all affidavits requested by Escrowee, and, upon completion, to furnish Escrowee with written acceptance of the improvements by Owner.

2.   To comply with all regulations, ordinances and laws of all public and private authorities having jurisdiction over the property and with all rules and regulations of any governmental agency insuring the loan; and to locate the improvements on the property, to comply with all building and set-back line requirements.

3.   Prior to the first disbursement hereunder, to furnish Escrowee with a detailed cost breakdown and to immediately notify Escrowee and Lender in writing of any change in said contract amounts or estimated costs.

4.   To execute payment requisitions or Escrowee's vouchers authorizing payments for labor, materials and services and to deliver to Escrowee paid bills and mechanic's and material men's lien waivers from those receiving payment, such waiver to include the total amount of the contract, if any, the specific labor and material for which payment is requested and any other information requested by Escrowee. No payments for labor, material or services will be authorized in excess of estimated cost as represented to Escrowee, without prior consent of Escrowee, and until labor and/or material have been incorporated in construction.

5.   Not to permit any changes in or additions to said plans, specifications and construction contract without written approval of Owner and Lender. Failure to secure such written approval shall render Contractor liable for any cost or damages resulting there from and Contractor hereby waives his right to make any additional charge for it.

6.   If at any time during the term of this agreement, Escrowee should determine that the construction contract amount is not sufficient to pay all cost incidental to the performance of the construction contract, the Contractor will, within seven (7) days after demand by Escrowee, deposit with Escrowee such additional funds as are necessary to pay such costs.


EXHIBIT
A

7.    To furnish insurance policies, with premium receipts, for the period of construction in favor of the Owner, Contractor, Lender and Escrowee, as their interests may appear, protecting against perils or workmen's compensation, public liability, property damage, and such other insurance policies as required by Escrowee, if any of such policies are not furnished by Owner.

8.    To request payment of no portion of his profit until all cost of construction or improvements has been paid in full and the improvements have been accepted by Owner.

9.    That should he breach any provision hereof and fail or neglect to properly begin to correct such breach within seven (7) days after receiving written notice from Owner or Escrowee of his default, or should the work cease for fifteen (15) consecutive days for causes other than those beyond his control, it shall be concluded that he has breached and abandoned this agreement. Determination by Escrowee that Contractor has either breached or abandoned construction shall be binding on Contractor and Owner. In the event of such breach or abandonment, Contractor shall have no claim to any sums on deposit with Escrowee, and shall have no mechanic's lien rights for any work or labor done or services performed. Should the balance then on deposit hereunder be less than the cost of finishing construction and the cost of all reasonable additional architectural and administrative services, Contractor shall pay to Escrowee any sums required for completion. Failure to make such payment upon demand by Escrowee shall render Contractor liable to Escrowee for costs of court and all attorneys' fees in addition to the amount required to complete.

**OWNER COVENANTS AND AGREES:**

10.    To pay, or cause to be paid to Escrowee, all funds shown in schedule under paragraph 39, all funds required for all extras hereafter authorized, and all funds for payment of all other items required under this agreement. Should the funds on deposit be insufficient to pay for all such construction costs, within seven (7) days after receiving written demand from Escrowee, Owner shall deliver to Escrowee all additional sums required.

11.    That Escrowee is Owner's agent only for the purpose of receiving funds shown in schedule under paragraph 39. Pending disbursement thereof, Escrowee may deposit such funds in an escrow account in any bank or banks of its choosing and collect interest thereon payable to Escrowee, being liable only for gross negligence in the handling and disbursing of such funds.

12.    To immediately notify the other parties hereto, in writing, of any deviation, defect or change in the construction of said improvements.

13.    To furnish insurance policies with premium receipts for the period of construction in favor of Owner, Lender and Escrowee, as their interest may appear, protecting against perils of fire, tornado, riots and civil commotion, public liability, property damage and malicious damage.

14.    To not allow any mechanic's liens on the property.

**LENDER COVENANTS AND AGREES:**

15.    To lend to Owner the amount of the loan set forth in paragraph 39, and accept therefore a note or notes secured by a mortgage on the above described property and other security Lender may require, and to pay, as requested by Escrowee, the full proceeds thereof to the Escrowee for the account of the Owner, but Lender shall be required to make no disbursement in violation of any State or Federal banking law or supervisory regulation.

16.    To release Escrowee from liability hereunder as well as under any Title Insurance Loan Policy to the extent Escrowee is prejudiced by Lender's failure to fund the loan, regardless of Lender's reason for failing to fund the loan.

**ESCROWEE COVENANTS AND AGREES:**

17.    That it will accept and use due care in disbursing funds in

accordance with this agreement, and it will hold Lender harmless from loss resulting from priority of any lien imposed by law for labor, services and materials furnished to improve the land over the lien of the mortgage to be insured, excepting liability for any amount, by which the cost of such labor, services or material exceeds the amount disbursed by the insured to pay for such labor, services or material, so that it or an affiliated title insurance company, issuing a Lender's title insurance policy, will be able to issue such policy in accordance with this provision.

## ALL PARTIES COVENANT AND AGREE:

18. That no material changes in or additions to the plans, specifications and construction contract under which this escrow is established shall be made without written approval of the Contractor, Owner and Lender.

19. Should there be any funds remaining after payment of the costs of construction of improvements and any other costs to be paid hereunder, such sums shall be returned by Escrowee to Owner.

20. The Lender and Escrowee, through their agents and inspectors, may enter upon the premises at any time to inspect the progress of construction.

21. That should Escrowee be authorized to pay funds from this escrow for land acquisition, permits, plans, architectural and engineering services, or for any other item prior to receipt by it of the out boundary and improvement (spot or location) survey, and should such survey disclose that the contemplated improvements cannot be legally constructed or expose defects which will be reported under any Lender's policy of title insurance, and should Lender and Owner either refuse or be unable to waive such defects, Escrowee shall not be liable for the amounts so paid and, at its election, may terminate this agreement with no further obligation by refunding to the party who deposited the same all unexpended sums held under this escrow.

22. That Contractor is agent for Owner and should Contractor fail to complete construction, Owner shall be responsible to Lender and Escrowee to complete all work in accordance with plans and specifications and pay all costs therefore. Should construction not be satisfactorily completed, in addition to any other remedy available to it, Lender may declare the note or notes secured by the mortgage due and payable without any other notice to or demand on Owner and may then proceed with foreclosure or may take such other legal action as it determines.

23. Escrowee has the right but not the obligation, and solely for its own protection to make such inspections, as it deems advisable. Lender, Owner and Contractor especially acknowledge that they do not and shall not rely upon any inspections, which Escrowee may make pursuant hereto.

24. That Escrowee, at its election, may make payments directly for any item required to be paid hereunder without first securing approval of Owner and/or Contractor. Excess funds in any one-line item may be transferred to any other line item(s) at Escrowee discretion.

25. That Escrowee is not responsible to see that the improvements are constructed in accordance with the plans and specifications; that the improvements contemplated under this Agreement will be completed or that sufficient funds will be available for completion; that the design engineering details, or architectural features are adequate or appropriate. Nor shall Escrowee be required to provide architectural supervision or inspection of construction, a "clerk of the works", or any services related to quality control or judgment. Further, all parties agree that Escrowee shall not be responsible for the filing and/or reporting of any IRS form 1099-Misc. in connection with the payments and disbursements made by Escrowee pursuant paragraph 39 of this agreement. And, as such, it shall be the Contractor, Owner, of Lender's responsibility and obligation to file and/or report said IRS Form 1099-Misc., respectively. Furthermore, the undersigned Contractor, Owner, and Lender hereby agree to indemnify and hold harmless Escrowee for any claims, loss, costs, damages, expenses and reasonable attorney fees in connection with said IRS Form 1099-Misc. reporting and filing.

26. That any charges of Lender, in addition to the charges shown in schedule under paragraph 39, shall be paid directly by Owner to Lender and

not withheld from the loan proceeds and that the full and total amount of loan shall be deposited with Escrowee.

27.    That this agreement, the accepted, approved and identified plans and specifications, and the construction contract, if any, deposited with Escrowee, and any additional agreements identified hereunder, shall comprise the entire agreement among the parties hereto. Any oral or written agreement between Owner or Contractor, not presented to Escrowee and approved in writing by it, shall be of no force and effect. Notwithstanding these provisions, Escrowee, to protect itself in the discharge of its obligations hereunder, may enter into security or other agreements with any party hereto.

28.    That Owner, Contractor and Lender will notify Escrowee in writing of any mechanics' or materialmens' liens or notice thereof which is served on them within three (3) days after receipt of such lien or notice.

29.    That Owner and/or Contractor will not install or cause to be installed any fixtures or equipment included in the plans and specifications, the payment for which shall be evidenced by a financing statement as provided for and defined under the provisions of the Uniform Commercial Code.

30.    That this agreement shall not be assignable by any party without the consent of the other parties but shall be enforceable against the heirs, executors and administrators of any individual party hereto and the successors of any corporate party.

31.    That, as used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter. The word "mortgage" as used herein, shall be interpreted to mean "deed of trust" should the instrument securing the loan be a deed of trust rather than a mortgage. The word "lender" shall be construed to mean 'cestui que trust" in the event such instrument is a deed of trust.

32.    In the event Contractor and owner are the same party, all of the covenants, and agreements hereof relative to the contractor and owner shall be applicable to said party.

33.    If Contractor and/or Owner and Lender have entered into a construction loan agreement which is not a part of this construction loan escrow agreement but does set forth certain rights and obligations between said parties and the lender elects to act under provision or provisions of said construction loan agreement and such election prevents Escrowee from further performance under this construction and disbursing agreement, Escrowee shall therewith have no further responsibility to perform under the construction and disbursing escrow agreement.

34.    Contractor and Owner have entered into a Construction Contract which is not a part of this Construction loan Escrow Agreement but does set forth certain rights and obligations between said parties.  Accordingly if Contractor and/or Owner elects to act under any provision of said Construction Contract and such election prevents Escrowee from further performance under this agreement, Escrowee shall be released from any further liability under this agreement after disbursement of any remaining funds in Escrowee's possession to Lender.

35.    Escrowee has the right to place a sign on the property indicating its role as disbursing agent and the right to use the project and the parties hereto as part of Escrowee's Marketing.

36.    Owner shall execute a Security Agreement in favor of Escrowee securing Owner's performance hereunder. Said Security Agreement to be recorded as junior to Lender's lien.

37.    The undersigned Contractor and Owner do hereby agree, both jointly and severally, to forever fully protect, defend, indemnify, reimburse and hold harmless Escrowee, its officers, directors and employees for any loss, cost, damages, escrow fees, reasonable attorney fees and expenses of every kind in nature which it may expend or incur under or by reason, or in consequence of any dispute between such parties in connection with this agreement, except for the gross negligence or willful misconduct of Escrowee, its employees or agent.

38.    Any party's failure to insist upon strict compliance of any provision hereof shall not be deemed a waiver of such provision or any other provision hereof.

AMENDMENTS AND ADDITIONS:

    39.  That the following is the schedule of amount to be paid hereunder to Escrowee and that the purposes for which disbursement shall be made by Escrowee:

ESCROWEE

| | |
|---|---|
| DISBURSING FEE | $5,800.00 |
| PREP FEE | $75.00 |

MISCELLANEOUS

| | |
|---|---|
| TOTAL SOFT COSTS | $5,875.00 |
| CONSTRUCTION CONTRACT AMOUNT   **PHASE 1** | $1,740,255.00 |
| CONSTRUCTION CONTRACT AMOUNT   **PHASE 2** | $2,934,245.00 |
| TOTAL CONSTRUCTION COSTS | $4,674,500.00 |
| LESS AMOUNT OF LOAN | $4,680,375.00 |
| OWNER'S EQUITY REQUIREMENT | $ |

IN WITNESS WHEREOF, the parties hereto have executed this agreement, this 17th day of January, 2006.

"ESCROWEE"
U.S. TITLE


BY: _____
NAME:   Sandra Gold
TITLE:  Disbursing Supervisor


"CONTRACTOR"
Arch Land Development L.L.C.


BY: _____
NAME:  L E LABRIER
TITLE:  MANAGER


"LENDER"
LaSalle Bank


BY: _____
NAME:   Paul a. LaKamp
TITLE:  Vice President


"OWNERS"
Paramount Properties, L.L.C.


BY: _____
NAME:



## GUARANTY OF PAYMENT AND COMPLETION

This GUARANTY OF PAYMENT AND COMPLETION dated as of September 13, 2005 (this "Guaranty"), is executed by Keith Barket ("Guarantor"), to and for the benefit of LASALLE BANK NATIONAL ASSOCIATION, a national banking association (the "Lender").

### RECITALS:

A.    The Lender has agreed to loan the principal amount of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) (the "Loan") to Paramont Properties, L.L.C., a Missouri limited liability company (the "Borrower") pursuant to the terms and conditions of that certain Promissory Note dated as of even date herewith (the "Note"). All terms not otherwise defined herein shall have the meanings set forth in the Note) between the Borrower and the Lender.

B.    As a condition precedent to the Lender's extension of the Loan to the Borrower and in consideration therefor, the Lender has required the execution and delivery of (i) this Guaranty by the Guarantor, (ii) that certain Promissory Note dated even date herewith, executed by the Borrower and made payable to the order of the Lender (the "Note"), evidencing the Loan, (iii) that certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of even date herewith, executed by the Borrower to and for the benefit of the Lender (the "Mortgage") encumbering the real property, improvements and personality described therein (the "Premises"), and (iv) the other Loan Documents (as defined in the Note).

C.    The Loan Proceeds will be used to develop certain improvements to the Premises (the "Project").

D.    The Guarantor is the sole member of the Borrower and, having a financial interest in the Premises, has agreed to execute and deliver this Guaranty to the Lender.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Guarantor hereby agrees as follows:

### AGREEMENTS:

1.    Guaranty of Payment. The Guarantor hereby unconditionally, absolutely and irrevocably guaranties to the Lender the punctual payment and performance when due, whether at stated maturity or by acceleration or otherwise, of the indebtedness and other obligations of the Borrower to the Lender evidenced by the Note and any other amounts that may become owing by the Borrower under the Loan Documents (such indebtedness, obligations and other amounts are hereinafter referred to as "Payment Obligations"). This Guaranty is a present and continuing guaranty of payment and not of collectibility, and the Lender shall not be required to prosecute collection, enforcement or other remedies against the Borrower or any other guarantor of the Payment Obligations, or to enforce or resort to any collateral for the repayment of the Payment Obligations or other rights or remedies pertaining thereto, before calling on the Guarantor for payment. If for any reason the Borrower shall fail or be unable to pay, punctually and fully, any of the Payment Obligations, the Guarantor shall pay such obligations to the Lender in full immediately upon demand. One or more successive actions may be brought against the Guarantor, as often as the Lender deems advisable, until all of the Payment Obligations are paid and performed in full. The Payment Obligations, together with all other payment and performance obligations of the Guarantor hereunder, are referred to herein as the "Obligations".

WA 

2.    <u>Performance Guaranty</u>.

(a)    The Guarantor absolutely, unconditionally and irrevocably undertakes and guarantees, for the benefit of the Lender and each and every present and future holder or holders of the Note or assignee or assignees of the Loan Documents, that all construction obligations of the Borrower for completion of the Project in accordance with the Plans and Specifications (as herein defined), the Loan Documents and other performance obligations of the Borrower under the Loan Documents (referred to herein as the "<u>Construction Obligations</u>") shall be diligently pursued and completed in accordance with the other terms and conditions contained in the Loan Documents, free and clear of any and all liens, charges, security interests and claims of any kind and nature whatsoever. The Guarantor shall cause the Construction Obligations to be performed, completed and paid for in the manner and at the applicable times required to be so performed, completed and paid for by the Borrower under the Note, to the extent that the Borrower fails to do so at any and all applicable times. As used herein, the term "<u>Plans and Specifications</u>" means a detailed budget for completion of the Project and a plat for the Premises as improved the Project.

(b)    Upon the occurrence of an Event of Default by the Borrower under the Loan Documents, the Guarantor agrees, on not more than fifteen (15) days written demand by the Lender (a "<u>Demand Notice</u>") to commence performance of the Construction Obligations and to diligently pursue performance thereof to completion, as described below. The Guarantor shall indemnify, defend and hold the Lender harmless from and against any and all loss, damage, cost, expense, injury or liability the Lender may suffer or incur in connection with third party claims brought as a result of the performance of the Construction Obligations by the Guarantor. If the Guarantor fails to commence and pursue diligently the performance of the Construction Obligations within fifteen (15) days after its receipt of a Demand Notice, then, either before or after pursuing any other remedy of the Lender against the Guarantor or the Borrower and regardless of whether the Lender shall ever pursue any such other remedy, the Lender shall have the right to complete the Construction Obligations, or call upon any other reputable parties to complete the Construction Obligations, in accordance with the Plans and Specifications (as may be modified in accordance with the terms of the Loan Documents) and shall have the right to expend such sums as the Lender in its discretion deems proper in order so to complete the Construction Obligations. During the course of any construction undertaken by the Lender or by any other party on behalf of the Lender, the Guarantor shall pay on demand any amounts due to any contractor, subcontractor and other material suppliers and for permits and licenses necessary to complete the Construction Obligations, without regard to any limitation on liability set forth herein. The Lender at any time may require the Guarantor to perform or supervise the performance of such work in lieu of the Lender or any party engaged by the Lender. The obligations of the Guarantor in connection with such work shall not be affected by any errors or omissions of the Borrower, the contractor, any subcontractor, or any agent or employee of any of them in design, supervision or performance of the work, it being understood that such risk is assumed by the Guarantor. Neither the completion of the Construction Obligations nor failure of said parties to complete the Construction Obligations shall relieve the Guarantor of any liabilities hereunder; rather, such liability shall be continuing, except as otherwise provided herein, and may be enforced by the Lender to the end that the Construction Obligations shall be completed timely as contemplated by the Loan Documents and the Plans and Specifications, free of any liens, and without loss, expense, injury or liability of any kind to the Lender.

(c)    For purposes of this Section 2, the Construction Obligations shall be deemed to be completed upon receipt by the Lender of (i) completion of the Project and (ii) construction date-down and interim mechanics' lien endorsements to the Title Policy, insuring the continuing validity and priority of the Mortgage for the full amount of the Loan theretofore disbursed, excepting only such items as shall be permitted under the Loan

WA 804975-1

Documents, and insuring over mechanics' and materialmen's liens arising (or which may arise) from work performed and materials supplied in connection with the construction of the Construction Obligations prior to the date of satisfaction of the conditions described in clause (i) above.

3.    <u>Representations and Warranties</u>.  The following shall constitute representations and warranties of the Guarantor, and the Guarantor hereby acknowledges that the Lender intends to make the Loan in reliance thereon:

(a)    Guarantor is not in default, and no event has occurred which, with the passage of time and/or the giving of notice, would constitute a default, under any agreement to which any Guarantor is a party, the effect of which will impair performance by such Guarantor of his obligations under this Guaranty.  Neither the execution and delivery of this Guaranty nor compliance with the terms and provisions hereof will violate any applicable law, rule, regulation, judgment, decree or order, or will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind that creates, represents, evidences or provides for any lien, charge or encumbrance upon any of the property or assets of the Guarantor, or any other indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which the Guarantor is a party or to which Guarantor or the property of Guarantor may be subject.

(b)    There are no litigation, arbitration, governmental or administrative proceedings, actions, examinations, claims or demands pending, or to the knowledge of the Guarantor, threatened that could adversely affect performance by Guarantor of his obligations under this Guaranty.

(c)    Neither this Guaranty nor any statement or certification as to facts previously furnished or required herein to be furnished to the Lender by the Guarantor, contains any material inaccuracy or untruth in any representation, covenant or warranty or omits to state a fact material to this Guaranty.

4.    <u>Continuing Guaranty</u>.  The Guarantor agrees that the performance of the Obligations by the Guarantor shall be a primary obligation, shall not be subject to any counterclaim, set-off, abatement, deferment or defense based upon any claim that the Guarantor may have against the Lender, the Borrower, any other guarantor of the Obligations or any other person or entity, and shall remain in full force and effect without regard to, and shall not be released, discharged or affected in any way by, any circumstance or condition (whether or not the Guarantor shall have any knowledge thereof), including without limitation:

(a)    any lack of validity or enforceability of any of the Loan Documents;

(b)    any termination, amendment, modification or other change in any of the Loan Documents, including, without limitation, any modification of the interest rate(s) described therein;

(c)    any furnishing, exchange, substitution or release of any collateral securing repayment of the Loan, or any failure to perfect any lien in such collateral;

(d)    any failure, omission or delay on the part of the Borrower, the Guarantor, any other guarantor of the Obligations or the Lender to conform or comply with any term of any of the Loan Documents or any failure of the Lender to give notice of any Event of Default (as defined in the Note);

WA 804975-1

(e) any waiver, compromise, release, settlement or extension of time of payment or performance or observance of any of the obligations or agreements contained in any of the Loan Documents;

(f) any action or inaction by the Lender under or in respect of any of the Loan Documents, any failure, lack of diligence, omission or delay on the part of the Lender to perfect, enforce, assert or exercise any lien, security interest, right, power or remedy conferred on it in any of the Loan Documents, or any other action or inaction on the part of the Lender;

(g) any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshalling of assets and liabilities or similar events or proceedings with respect to the Borrower, the Guarantor or any other guarantor of the Obligations, as applicable, or any of their respective property or creditors, or any action taken by any trustee or receiver or by any court in any such proceeding;

(h) any merger or consolidation of the Borrower into or with any entity, or any sale, lease or transfer of any of the assets of the Borrower, the Guarantor or any other guarantor of the Obligations to any other person or entity;

(i) any change in the ownership of the Borrower or any change in the relationship between the Borrower, the Guarantor or any other guarantor of the Obligations, or any termination of any such relationship;

(j) any release or discharge by operation of law of the Borrower, the Guarantor or any other guarantor of the Obligations from any obligation or agreement contained in any of the Loan Documents; or

(k) any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing and whether foreseen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which otherwise might limit recourse against the Borrower or the Guarantor to the fullest extent permitted by law.

5. <u>Waivers</u>. The Guarantor expressly and unconditionally waives (i) notice of any of the matters referred to in Section 3 above, (ii) all notices which may be required by statute, rule of law or otherwise, now or hereafter in effect, to preserve intact any rights against the Guarantor, including, without limitation, any demand, presentment and protest, proof of notice of non-payment under any of the Loan Documents and notice of any Event of Default or any failure on the part of the Borrower, the Guarantor or any other guarantor of the Obligations to perform or comply with any covenant, agreement, term or condition of any of the Loan Documents, (iii) any right to the enforcement, assertion or exercise against the Borrower, the Guarantor or any other guarantor of the Obligations of any right or remedy conferred under any of the Loan Documents, (iv) any requirement of diligence on the part of any person or entity, (v) any requirement on the part of the Lender to exhaust any remedies or to mitigate the damages resulting from any default under any of the Loan Documents, and (vi) any notice of any sale, transfer or other disposition of any right, title or interest of the Lender under any of the Loan Documents.

6. <u>Subordination</u>. The Guarantor agrees that any and all present and future debts and obligations of the Borrower to the Guarantor are hereby subordinated to the claims of the Lender and are hereby assigned by the Guarantor to the Lender as security for the Obligations and the obligations of the Guarantor under this Guaranty.

4

WA 804975-1

7. <u>Subrogation Waiver</u>. Until the Obligations are paid in full and all periods under applicable bankruptcy law for the contest of any payment by the Guarantor or the Borrower as a preferential or fraudulent payment have expired, the Guarantor knowingly, and with advice of counsel, waives, relinquishes, releases and abandons all rights and claims to indemnification, contribution, reimbursement, subrogation and payment which the Guarantor may now or hereafter have by and from the Borrower and the successors and assigns of the Borrower, for any payments made by the Guarantor to the Lender, including, without limitation, any rights which might allow the Borrower, the Borrower's successors, a creditor of the Borrower, or a trustee in bankruptcy of the Borrower to claim in bankruptcy or any other similar proceedings that any payment made by the Borrower or the Borrower's successors and assigns to the Lender was on behalf of or for the benefit of the Guarantor and that such payment is recoverable by the Borrower, a creditor or trustee in bankruptcy of the Borrower as a preferential payment, fraudulent conveyance, payment of an insider or any other classification of payment which may otherwise be recoverable from the Lender.

8. <u>Reinstatement</u>. The obligations of the Guarantor pursuant to this Guaranty shall continue to be effective or automatically be reinstated, as the case may be, if at any time payment of any of the Obligations or the obligations of the Guarantor under this Guaranty is rescinded or otherwise must be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Guarantor or the Borrower or otherwise, all as though such payment had not been made.

9. <u>Financial Statements</u>. The Guarantor represents and warrants to the Lender that (a) the financial statements of Guarantor previously submitted to the Lender are true, complete and correct in all material respects, disclose all actual and contingent liabilities, and fairly present the financial condition of Guarantor, and do not contain any untrue statement of a material fact or omit to state a fact material to the financial statements submitted or this Guaranty, and (b) no material adverse change has occurred in the financial statements from the dates thereof until the date hereof. The Guarantor shall furnish to the Lender annual financial statements for each calendar year no later than ninety (90) days after the end of such years certified by Guarantor as true, complete and correct and otherwise in a form substantially similar to the form of financial statements previously submitted by Guarantor to the Lender, unless otherwise approved in writing by the Lender.

10. <u>Transfers; Sales, Etc.</u> The Guarantor shall not sell, lease, transfer, convey or assign any of his assets, unless (a) if such Guarantor is an individual, such sale, lease, transfer, conveyance or assignment is of a non-material asset of such Guarantor, or (b) if such Guarantor is a corporation, partnership or other entity, such sale, lease, transfer, conveyance or assignment is performed in the ordinary course of its business consistent with past practices, and will not have a material adverse effect on the business or financial condition of such Guarantor or its ability to perform its obligations hereunder. In addition, such Guarantor shall neither become a party to any merger or consolidation, nor, except in the ordinary course of its business consistent with past practices, acquire all or substantially all of the assets of, a controlling interest in the stock of, or a partnership or joint venture interest in, any other entity.

11. <u>Enforcement Costs</u>. If: (a) this Guaranty, is placed in the hands of one or more attorneys for collection or is collected through any legal proceeding; (b) one or more attorneys is retained to represent the Lender in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this Guaranty, or (c) one or more attorneys is retained to represent the Lender in any other proceedings whatsoever in connection with this Guaranty, then the Guarantor shall pay to the Lender upon demand all fees, costs and expenses incurred by the Lender in connection therewith, including, without limitation, reasonable attorney's fees, court costs and filing fees (all of which are referred to herein as the "<u>Enforcement Costs</u>"), in addition to all other amounts due hereunder.

WA 804975-1

12.   <u>Successors and Assigns; Joint and Several Liability</u>.  This Guaranty shall inure to the benefit of the Lender and its successors and assigns.  This Guaranty shall be binding on the Guarantor and his heirs, legatees, devisees and assigns.  The Guarantor agrees and acknowledges that the liability of the Guarantor hereunder is independent of any other guarantees or other obligations at any time in effect with respect to the Obligations or any part thereof, and that the liability of the Guarantor hereunder may be enforced regardless of the existence, validity, enforcement or non-enforcement of any such other guarantees or other obligations.

13.   <u>No Waiver of Rights</u>.  No delay or failure on the part of the Lender to exercise any right, power or privilege under this Guaranty or any of the other Loan Documents shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege shall preclude any other or further exercise thereof or the exercise of any other power or right, or be deemed to establish a custom or course of dealing or performance between the parties hereto.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.  No notice to or demand on the Guarantor in any case shall entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

14.   <u>Modification</u>.  The terms of this Guaranty may be waived, discharged, or terminated only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.  No amendment, modification, waiver or other change of any of the terms of this Guaranty shall be effective without the prior written consent of the Lender.

15.   <u>Joinder</u>.  Any action to enforce this Guaranty may be brought against the Guarantor without any reimbursement or joinder of the Borrower, or any other guarantor of the Obligations in such action.

16.   <u>Severability</u>.  If any provision of this Guaranty is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, the Guarantor and the Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this Guaranty and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

17.   <u>Applicable Law</u>.  This Guaranty is governed as to validity, interpretation, effect and in all other respects by laws and decisions of the State of Illinois.

18.   <u>Notices</u>.  All notices, communications and waivers under this Guaranty shall be in writing and shall be (a) delivered in person, (b) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (c) by overnight express carrier, addressed in each case as follows:

To the Lender:          LaSalle Bank National Association
                        135 South LaSalle Street, Suite 1225
                        Chicago, Illinois  60603
                        Attention:  Commercial Real Estate Division
                        Karen Case, GSVP

AND                     LaSalle Bank National Association
                        1 North Brentwood Boulevard, Suite 950
                        St. Louis, Missouri  63105
                        Attention:  Commercial Real Estate Division
                        Robert Binsbacher

WA 804975-1

With a copy to:                       Spencer Fane Britt & Browne LLP
                                          1 North Brentwood Blvd., Suite 1000
                                          St. Louis, Missouri 63105-3925
                                          Attention: James R. Dankenbring, Esq.

To the Guarantor:                    Keith Barket
                                          c/o Paramont Properties, L.L.C.
                                          705 Olive St., 4th Floor
                                          St. Louis, Missouri 63101

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other parties hereto. All notices sent pursuant to the terms of this Section shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, or (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

19.      <u>CONSENT TO JURISDICTION</u>. TO INDUCE THE LENDER TO ACCEPT THIS GUARANTY, THE GUARANTOR IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS GUARANTY WILL BE LITIGATED IN COURTS HAVING SITUS IN CHICAGO, ILLINOIS. THE GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CHICAGO, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE GUARANTOR AT THE ADDRESSES STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

20.      <u>WAIVER OF DEFENSES</u>. OTHER THAN CLAIMS BASED UPON THE FAILURE OF THE LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, THE GUARANTOR WAIVES EVERY PRESENT AND FUTURE DEFENSE (OTHER THAN THE DEFENSE OF PAYMENT IN FULL), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE GUARANTOR OR THE BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY LENDER IN ENFORCING THIS GUARANTY OR ANY OF THE LOAN DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER.

21.      <u>WAIVER OF JURY TRIAL</u>. THE GUARANTOR AND THE LENDER (BY ACCEPTANCE HEREOF), HAVING BEEN REPRESENTED BY COUNSEL, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS GUARANTY OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE GUARANTOR AGREES THAT GUARANTOR WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

22.      <u>Counterparts; Facsimile Signatures</u>. This Guaranty may be executed in any number of counterparts, all of which shall be taken to be one and the same instrument, for the same effect as

7

WA 804975-1

if all parties hereto had signed the same signature page.  Receipt of an executed signature page to this Guaranty by facsimile or other electronic transmission shall constitute effective delivery thereof.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the date first above written.

Name: Keith Barket

WA 804975-1

## MEMBER'S CERTIFICATE



The undersigned hereby certifies that he is the of Sole Member of Paramont Properties, L.L.C., a Missouri limited liability company (the "Company"), and as such is the custodian of the Company's books and records and is authorized to execute and deliver this Certificate in connection with the loans being made to the Company by LaSalle Bank, National Association ("Bank") pursuant to the Promissory Note ("Note") dated September 13, 2005. Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the Note. In order to induce Bank to execute the Note and make the loans, the undersigned certifies (in his capacity the Sole Member) as follows:

1.      Attached as Attachment 1 hereto is a full, complete, and correct copy of the Company's Certificate of Organization ("Certificate") as filed and recorded with the Secretary of State of Missouri, which Certificate has not been rescinded or amended and remains in full force and effect in its entirety.

2.      Attached as Attachment 2 hereto is a copy of the Operating Agreement of the Company ("Operating Agreement"), and as of the date hereof the Operating Agreement is in full force and effect and has not been amended or rescinded.

3.      Attached as Attachment 3 hereto is a copy of the Resolution of the Sole Member of the Company duly adopted by the by written consent in conformity with the corporate and other laws of such Company's state of organization and with the Company's Certificate and Operating Agreement. There is no provision of Company's Certificate or Operating Agreement limiting or contravening the Resolutions attached as Attachment 3, which Resolutions have not been amended, modified, revoked or rescinded and are in full force and effect.

4.      As of the date hereof, no Certificate of Dissolution has been filed by the Company with the Missouri Secretary of State.

5.      The undersigned, as Sole Member of the Company, is qualified to act in such capacity and to execute and deliver on behalf of the Company, all the documents necessary and proper to effectuate the loan being made to the Company by the Bank, including, but not limited to, the Note and all other Loan Documents, and the signature set opposite his name is the authentic signature of the undersigned:

| Name | Title | Signature |
|------|-------|-----------|
| Keith Barket | Sole Member | |

IN WITNESS WHEREOF, the undersigned has executed this certificate to be effective as of September 13, 2005.

Keith Barket, Sole Member of
Paramont Properties, L.L.C.

WA 804967.2

STATE OF MISSOURI    )

                        ) ss:

COUNTY OF ST. LOUIS    )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DO HEREBY CERTIFY that Keith Barket, the Sole Member of Paramont Properties, L.L.C., a Missouri limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Sole Member, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 13th day of September, 2005.

_____
Notary Public

My Commission Expires:

" NOTARY SEAL "
Yvonne C. Merlotti, Notary Public
St. Louis County, State of Missouri
My Commission Expires 7/30/2007

2

WA 804967.2

# STATE OF MISSOURI



## Judith K. Moriarty
### SECRETARY OF STATE

CERTIFICATE OF ORGANIZATION

LIMITED LIABILITY COMPANY

WHEREAS,

PARAMONT PROPERTIES, L·L·C·

FILED ITS ARTICLES OF ORGANIZATION WITH THIS OFFICE ON THE
14TH DAY OF APRIL, 1994, AND THAT FILING WAS FOUND TO CONFORM
TO THE MISSOURI LIMITED LIABILITY COMPANY ACT;

NOW, THEREFORE, I, JUDITH K· MORIARTY, SECRETARY OF STATE, STATE
OF MISSOURI, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY LAW, DO
CERTIFY AND DECLARE THAT ON THE 14TH DAY OF APRIL, 1994,
THE ABOVE ENTITY IS A LIMITED LIABILITY COMPANY, ORGANIZED IN
THIS STATE AND ENTITLED TO ANY RIGHTS GRANTED TO LIMITED
LIABILITY COMPANIES·

IN TESTIMONY WHEREOF,  I HAVE SET MY
HAND AND IMPRINTED THE GREAT SEAL OF
THE STATE OF MISSOURI,  ON THIS, THE
14TH DAY OF APRIL, 1994·



*Judith K. Moriarty*
Secretary of State

$100·00

2

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT, made and entered into this 14th day of May, 1996. by Keith Barket, the sole owner of all interest in and to Paramont Properties, L.L.C., a Limited Liability Company, duly organized, pursuant to law, and Charter issued by the Secretary of State of Missouri.

Said Keith Barket, being the sole and only owner of shares or beneficial interest in and to Paramont Properties, L.L.C., is hereby authorized to manage and operate the affairs of Paramont Properties, L.L.C., and to do all things allowed and required of him to affectuate the purposes set forth in its charter.

_____
KEITH BARKET

STATE OF MISSOURI    )
                     )    S.S.
CITY OF ST. LOUIS    )

Subscribed and sworn to before me, a Notary Public, this 14th day of May, 1996.

_____

My commission expires:

JENNY L MERTENS
Notary Public - Notary Seal
STATE OF MISSOURI
ST. LOUIS COUNTY
MY COMMISSION EXP. MAR. 2,2000

**EXHIBIT C**

**TO MEMBER'S CERTIFICATE**

**RESOLUTION**

**OF THE SOLE MEMBER OF**

**PARAMONT PROPERTIES, L.L.C.**

The undersigned, being the Sole Member of Paramont Properties, L.L.C., a Missouri limited liability company (the "Company"), does hereby adopt the following resolutions on behalf of the Company:

WHEREAS, the Company is borrowing funds ("Loan") from LaSalle Bank, National Association, a national banking association ("Bank") pursuant to that certain Promissory Note dated September 13, 2005 (the "Note"), in the form presented to the Sole Member;

WHEREAS, the Sole Member has determined that it is in the Company's best interest to enter into the Note and all other Loan Documents (as such term is defined in the Note), in the forms presented to and reviewed by the Sole Member, in favor of the Bank, to induce the Bank to make the Loan to the Company.

RESOLVED, that the Sole Member of the Company should be, and he hereby is, authorized, empowered and directed to perform such acts and to execute and deliver the Note and the other Loan Documents to the Bank, and any such other instruments as may be necessary or proper in order to implement the Loan.

DATED effective as of the 13th day of September, 2005.

_____
Keith Barket, Sole Member

WA 804967.2